IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 1:15-CV-679 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS | ) | MEMORANDUM OPINION |
| OF ENGINEERS, *et al.*, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |

This case is before the Court on Plaintiff, State of Ohio's Motion for Temporary Restraining Order and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. (ECF #13). Defendants, United States Army Corps of Engineers, John M. McHugh, Jo-Ellen Darcy, Thomas P. Bostick, Richard G. Kaiser, and Karl D. Jansen filed a Memorandum in Opposition to the Motion, and Plaintiff filed a Reply in Support of its request. (ECF #25, 28). The Court held an expedited hearing on the motion on May 11, 2015. Neither party presented witnesses or additional evidence. The issue is now ripe for determination.

## Statement of Facts[1]

The United States Army Corps of Engineers ("the Corps") is an agency of the Federal Government that is responsible for protecting and serving the nation's rivers and harbors in a manner that meets all environmental standards. One way the Corps maintains its lakes, rivers and navigational channels is by removing sediment and other material that has accumulated at the bottom of the bodies of water. This process is called "dredging." Dredging is used to maintain the depth of rivers and channels to enhance their navigability.

Locally, dredging is necessary to maintain the depth of the waterways and allow sufficient clearance for large cargo ships navigate along the Cuyahoga River in an area known as the The Cleveland Harbor Federal Navigational Channel ("Cleveland Harbor"). (ECF #1, §2). The Cleveland Harbor consists of three sections of water: 5.5 miles of shoreline enclosed by breakwater structures, 5.8 miles of the lower Cuyahoga River, and 1 mile of the Old River. (ECF #13-2, p. 2). The Old River is also known as the Cuyahoga Navigational Channel ("the Channel"), and is sometimes referred to by the parties as the "sixth mile".

Several industrial facilities are served by the commercial ships traversing the Cleveland Harbor. One such facility is ArcelorMittal Cleveland, which is one of the largest and most productive steel mills in the world. (ECF 13-31, ¶5).[2] This plant employs 1,900 people and has an

---

[1] The factual summary is based upon the parties' statements of facts and representations made at oral argument. Those material facts which are controverted are stated in a light most favorable to Defendants, the non-moving parties. Such statements are taken as true for purposes of this Motion only, and should not be considered established for purposes of any future proceedings.

[2] Plaintiff refers to this Exhibit as the "Declaration of Clarence Hauge," but this Court takes notice that it is actually the "Declaration of Eric Hauge."

annual raw steel production capacity of 3.8 million tons. (Id. at ¶¶4 and 5). Sixty percent of the steel produced from ArcelorMittal Cleveland is used in the State of Ohio for construction and by Ohio manufacturers. (Id. at ¶5). If appropriate dredging of the waterways does not occur, and commercial vessels are not able to safely traverse the waters, ArcelorMittal Cleveland and other commercial entities would face significant threats to the continuation of their business and all of the entities relying on the steel produced in that plant could suffer a significant loss of resources.

The Corps has been given authorization and funding from Congress to dredge the Cleveland Harbor annually since the Clean Water Act was enacted approximately forty years ago. Again in 2015, Congress authorized the Corps to dredge the Cleveland Harbor and allocated funds for the dredging and disposal of sediment and other dredging materials ("sediment"). The dredging project was originally scheduled to begin on or after May 15, 2015. Once dredging is completed, the sediment removed must be disposed of in an environmentally sound manner. The State has authority under the Clean Water Act to determine enforceable environmental standards for the discharge of materials into Lake Erie. 33 U.S.C. §§ 1251 *et seq*. It also has the responsibility to issue water quality certificates for projects that seek permission to discharge environmentally safe materials into the protected waters.

In preparation for the 2015 dredging project, the Corps applied for an Ohio water quality certification pursuant to Section 401 of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. which would allow it to dispose of the sediment. (ECF #13, p. 17). During the application process, the Corps performed an analysis of the sediment in various sections of the Cleveland Harbor. It used the results of this sediment analysis and applied an agency created "Federal Standard" to determine what sediment disposal methods it believed were necessary in order to safely dispose of the

sediment. The Federal Standard is a regulation that requires the Corps to identify and use "the dredged material disposal alternatives ... which represent the least costly alternatives consistent with sound engineering practices, which meet the environmental standards established by the 404(b)(1) evaluation process or ocean dumping criteria." 33 C.F.R. §335.7. It is estimated that CDF disposal would cost Defendants approximately $423,050.00 for the CDF itself, and another $712,500.00 for material handling fees over the 2016 and 2017 project portions, just for the portion of sediment taken from the Channel portion of the project. (ECF #13-2, Ex. B, B-4, B-4a-e). Considering the results of the sediment analysis and the proposed cost of CDF standard, and applying the Federal Standard, the Corps concluded that sediment dredged from most of the Cleveland Harbor should be disposed of in a confined disposal facility or CDF. However, the Corps believes that sediment removed from the Channel, which is the southernmost mile of the Cleveland Harbor would be safe to put into the open waters of Lake Erie at a site owned by the State of Ohio. (Id. at Ex. B). This is the disposal method the Corps proposed during the application process when seeking a water quality certificate from the State.

On March 31, 2015, the State approved a certificate for dredging the entire Cleveland Harbor, but included a requirement that all dredging materials from the entire length of the Cleveland Harbor be disposed of in a CDF, including the sediment from the Channel. The Ohio Environmental Protection Agency and the Ohio Department of Natural Resources would not permit any discharge into the open waters of Lake Erie.. (Id. at Ex. A). The State refused the Corps proposal for open water discharge based on its determination that the Channel sediment contains carcinogenic toxins - specifically polychlorinated biphenyls ("PCBs"), which are persistent and bioaccumulative. (ECF #13-2, §8). Once PCBs enter the food chain, they remain

-4-

substantially intact and concentrate in increasing amounts as they move through the food chain. Eventually, humans absorb these PCBs by consuming fish or other wildlife that had previously absorbed these toxins. (ECF #1, para. 6).

The Corps agreed with the requirement for CDF disposal with regard to most of the sediment collected from the Cleveland Harbor project, but disagreed that such methods were necessary for the sediment collected from the Channel based upon their analysis of the sediment and the application of the cost saving requirements set forth in the Federal Standard. (ECF #25, pp. 1-2). Rather than appeal or otherwise challenge the disposal requirements contained in the water quality certification issued by the State, the Corps declared that it would not bear the cost of CDF disposal for the Channel sediment. Therefore, it gave the State an ultimatum: either find a way to pay for the CDF disposal for the Channel sediment with non-federal money, or the Corps will not dredge that section of the Cleveland Harbor.

The State filed this action to compel the Corps to dredge the Channel as originally planned, and to require them to pay for the disposal of the dredging materials in compliance with the certificate requirements. In order to spur the Corps on to begin the dredging as scheduled, the State offered to set aside the $1,135,550.00 it would cost to dispose of the dredged sediment into the environmentally friendly CDFs, pending a determination by this Court as to whom should bear the burden of this extra disposal cost.

### Legal Standard

The primary purpose of injunctive relief is to maintain the status quo until a decision on the merits can be reached. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In

addition, courts shall not issue injunctive relief unless the right to such relief is clear under the facts and circumstances of the case. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). In determining whether to issue injunctive relief, courts must consider four factors. Those factors are: (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant will suffer irreparable injury in the absence of injunctive relief; (3) whether the issuance of injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of injunctive relief. *See, e.g., Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

As a general matter, these four considerations are factors to be balanced and not prerequisites that must be satisfied. *Id.* at 739.

### Analysis

Upon receiving notice that materials from the Cuyahoga Navigational Channel were also subject to disposal in CDF's, at an additional expense of approximately $423,050.00 for the facility, and another $712,500.00 estimated for material handling fees over the 2016 and 2017 project portions, the Corps did not appeal the decision. Rather it simply decided it would not dredge this portion of the Cleveland Harbor unless the State or some other non-federal entity agreed to pay. (ECF #13-5), The State filed this action to compel the Corps to dredge the Cuyahoga Navigational Channel as originally planned, and to require them to pay for disposal of the dredging materials in compliance with the requirements of the water quality certificate issued by the State. The question currently before the Court on the Plaintiff's Motion for Preliminary Injunction is whether the State has shown that preliminary injunctive relief is warranted, and that

the Corps should be forced to dredge the Cuyahoga Navigational Channel as previously scheduled.

A. Likelihood of Success on the Merits

The first factor in the Court's determination is whether the State can show that it has a strong likelihood of succeeding on the merits. The underlying issues to be determined in this case are: (1) whether the Corps is legally required to dredge the Channel; and, (2) if so, whether they must bear the cost of CDF disposal up front, pending a full trial on the validity of the State's disposal requirements and the Corps' statutory obligations with regard to disposal and payment.

Defendants argue that they are not legally required to dredge the Channel at this time. Further, they argue that their decision not to dredge is committed to agency discretion by law and is, therefore, not reviewable by the Courts. Plaintiff contends that the decision is an appealable final agency decision, and that the Corps is statutorily obligated to dredge the Channel under the Water Resources Development Acts of 2000 and 2007 ("WDRA"). 33 U.S.C. §§ 426o-1, 426o-2. Although discretionary agency decisions are generally non-reviewable, such decisions may be reviewed and overturned if they unlawfully withhold or delay necessary action, or if they are otherwise not in accordance with the law. 5. U.S.C. §§ 706(1), 706(2). An agency's decision cannot prevail if it violates the Constitution or a federal statute. *Stinson v. U.S.*, 508 U.S. 36, 45 (1993). Therefore, the Corps' decision not to dredge the Channel is reviewable at least to the extent that the Court can determine whether it violates the WDRA or any other federal statute.

The WDRA charges the Corps with the preservation of coastal and channel waters connected with the Great Lakes. The first provision dealing specifically with dredging obligations states in relevant part:

> In operating and maintaining Federal channels and harbors of, and the connecting channels between, the Great Lakes, the Secretary shall conduct such dredging as is necessary to ensure minimal operation depths consistent with the original authorized depths of the channels and harbors when water levels in the Great Lakes are, or are forecast to be, below the International Great Lakes Datum of 1985.

33 U.S.C. § 426o-1.

Under the mandatory language of this provision, the Corps would be obligated to dredge the Channel if the depths of the Channel are forecasted to drop below the statutory threshhold amount. Although Plaintiff has cited this statute and has argued that the Channel depth is approaching a dangerously low level that would preclude commercial ship traffic, neither side has indicated whether these levels are forecasted to drop below the statutory mandatory minimum threshold in 2015. The Court, therefore, cannot make a determination as to the applicability of this mandatory provision at this time.

The next provision cited by Plaintiff, however, is relevant in this case and may obligate the Corps to take action. Titled "Great lakes navigation and protection," 33 U.S.C. § 426o-2 states:

> Using available funds, the Secretary shall expedite the operation and maintenance including dredging, of the navigation features of the Great Lakes and Connecting Channels for purposes of supporting commercial navigation to authorized project depths.

Defendants argue that this statutory obligation is "vague and diffuse" requiring only some unspecified assistance that would "expedite" operation and maintenance of all of the Great Lakes when funding is available. However, in this case, according to the uncontested information presented in the Plaintiff's briefs and at the oral hearing, the dredging of the Channel is part of a previously authorized project, specifically approved by Congress. In addition, Congress has already approved full funding for the project including a line item approval of the cost of the CDF

disposal for all sediment recovered for the full six mile stretch. Under the specific facts of this case, therefore, the obligation created by this statute was specifically defined by Congress through its original authorization of the dredging of this particular Channel, and the appropriation of all funds necessary to accomplish this task to the specifications of the State's water quality certification.

Further, Plaintiff has cited a forty-year history of Congressional support and acknowledgment of the need to dredge this Channel in order to facilitate commercial, deep-draft navigation. Congress has allocated funds to allow CDF disposal of the sediment obtained by dredging the Cleveland Harbor nearly every year since the Clean Water Act was enacted, except during a short period in the 1990s where the sediment was used for beach nourishment. The Ohio Environmental Protection Agency and the United States Environmental Protection Agency jointly determined that the beach nourishment practice was inappropriate, however, and it was soon stopped.

According to information presented at oral argument, the Corps, itself, acknowledged in its application for water quality certification that if the Channel were not dredged, the harbor would no longer be a viable alternative for commercial transportation of goods. They allegedly acknowledged that the loss of even one to two feet of depth could result in economic losses to the area in excess of $2 billion annually. Nonetheless, when the State would not issue a certificate to allow open water dumping of the dredged materials, the Corps did not appeal the decision, or otherwise attempt to negotiate or legally challenge this finding. Rather they simply refused to dredge the Channel, even though they had the authorization and funding from Congress to do so, and even though they, themselves, had recognized the potentially devastating effects of failing to

dredge this area.

Refusing to dredge possibly the most commercially significant section of the Cleveland Harbor, after receiving specific Congressional approval and funding to do so, violates the Corps' duty to expedite operation and maintenance of the Channel to authorized project depths, and would fail to support (and in fact could actually destroy) commercial navigation through this channel. The Court, therefore, finds that the Corps' decision to terminate a previously approved, long-standing commitment to dredge a Channel of the Great Lakes, when both the specific project and its funding had already been approved by Congress, simply because it did not want to expend the full authorized amount in order to comply with the State's water quality certification requirements, violates the statutory requirements of 33 U.S.C. § 426o-2, and is otherwise unlawful, arbitrary and/or capricious. On this basis, the Court concludes that if the above facts presented in Plaintiff's briefs and at the hearing on this Motion for Preliminary Injunction are proven true at trial, the Plaintiff has a strong likelihood of success in its quest to prove that the Corp's decision not to dredge the Channel under these circumstances is unlawful and should be overruled.

Further, assuming that the dredging of the Channel should move forward, Plaintiff has cited law that requires the Corps to abide by all state and local environmental requirements when disposing of the dredged material. Title 33 U.S.C. § 1323 requires that all federal agencies, engaged in any activity which may result in the discharge of pollutants, "shall be subject to, and comply with all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution." 33 U.S.C. § 1323(a). Agencies are also required to obtain a certification from the State in which any discharge

will originate. 33 U.S.C. § 1341(a)(1).

In this case, the State refused to issue a certificate for open water disposal based on toxins allegedly present in the sediment. The Court has not been presented with any information or argument which would allow it to determine whether the CDF disposal requirement was required to enforce established State and local requirements under the Clean Water Act; whether the sediment at issue in fact meets the written standards under Section 404(b)(1) of the Clean Water Act as Defendants have alleged; or, whether compliance with Section 404(b)(1) is sufficient to satisfy the requirements of 33 U.S.C. § 1323(a).[3] (ECF #13-5 p. 1). Nonetheless, based on the information that has been provided, and based on Defendants' failure to appeal the certification requirements, it appears likely that Plaintiff could prevail on its claim that the Corps is financially responsible for disposing of the Channel sediment in accordance with the terms of the certification. Therefore, based on the information currently before the Court, it appears that the Plaintiff has a strong likelihood of success with regard to its claim that the Corps is required to pay for CDF disposal of the sediment obtained through dredging the entire Cleveland Harbor. These findings weigh heavily in favor of granting Plaintiff's request for Preliminary Injunction.

---

[3] Defendants argue that they also have a competing statutory obligation under 33 U.S.C. § 419a to take measures to extend the capacity of dredged material disposal areas by not placing materials in CDF's unnecessarily. This statutory provision, however, is not aimed at reclassifying potentially toxic sediment to avoid use of the CDFs, but rather seeks to develop methods or reducing or consolidating the volume of material disposed of through such means as "construction of dikes, consolidation and dewatering of dredged material, and construction of drainage and outflow facilities." *Id.*

B. <u>Balancing of Potential Harm/Irreparable Harm</u>

Under the standard for granting a preliminary injunction, in addition to analyzing the likelihood of success on the merits, the Court must also consider (1) the potential for irreparable harm to Plaintiff if the injunction is denied, (2) the potential harm to others if the injunction is granted, and (3) the advancement of the public interest. *See, e.g., Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000). The potential for irreparable harm to Plaintiff, if the injunction is denied, far outweighs the potential harm to Defendants if the injunction is granted. Both parties have at stake the cost of disposal, which, at over $1.13 million is not insignificant. However, the federal government has already allocated these funds and made them available through their funding of the federal government's Great Lakes maintenance and operational duties. This means that in all likelihood, the government will be spending this money on similar or related projects whether or not the Corps is forced to pay for CDF disposal in this instance. On the other hand, the State of Ohio has not contemplated the need for allocation of these funds in their current budget. They entered into this transaction with the belief that the federal government, as they had for the last forty odd years, would be responsible for paying for the dredging operations and disposal.

The cost of disposal is the only potential harm the Defendants would face, and, even if the injunction is granted they maintain the possibility of recovering those funds if they are able to win the case on its merits after full discovery and case development. Conversely, in addition to the potential economic harm from bearing the cost of CDF disposal, the State faces a multitude of potential harms, some of which extend beyond mere economic damages, if the dredging is not completed in a timely manner.

Unless immediate action is taken, the State will be forced to forego dredging of the

Channel, or acquiesce to the dumping of toxic sediment in the open waters of Lake Erie. The Corps' offer to continue with the dredging of this section if the State or some other non-federal entity foots the bill for the CDF disposal shows that it considers the dredging of this Channel to be a Corps priority project. Therefore, the current refusal to proceed absent a financial contribution from the State appears to be nothing more than an attempt to deflect costs that the agency is statutorily mandated to bear itself. The State cannot be blackmailed into contributing to these costs under threat of shutting down what is potentially the most commercially important section of the project.

As the Corps, itself, has recognized, the dredging of the Channel is necessary to Ohio's economy. The evidence thus far has shown that the Channel has already suffered significant reduction in depth that has limited the commercial traffic and economic viability of the industries served by that section of the Cleveland Harbor. Failure to complete the dredging in a timely manner, as originally planned, could cause the Channel to become unnavigable, leading to the shut down of local and regional industries, job losses, reduced tax revenues leading to loss of essential services to Ohio citizens, and reputational losses within the commercial shipping industry that could have detrimental long term effects on the Cleveland area and the State. The potential loss of jobs and other consequences stretch far beyond the typical economic damages that may be simply reallocated among the parties at the end of a extended litigation. These harms are irreparable once triggered, and cannot be reversed by a monetary judgment if Defendants eventually prevail. Further, these harms affect not only the Plaintiff, but could have devastating effects on the general public, as well.

If the State did decide that it had no choice but to acquiesce to the Corps suggested

disposal manner in order to prevent the potentially devastating effects of allowing the Channel to become unnavigable, it would face a different sort of irreparable harm from the potential introduction of long lasting carcinogenic toxins into Lake Erie. The pollution of a Great Lake affects not only the State of Ohio and the Cleveland Harbor area, but has an effect on the many other areas of the country that rely on the resources of the Great Lakes for freshwater, fish, and other resources. If the sediment contains levels of toxin, including PCBs, that exceed the allowable discharge under federal, state, or local law, the Corps is statutorily prohibited from dumping that sediment in the lake. As Ohio has refused to issue a water quality certificate that would allow lake discharge, and as the Corps did not appeal this decision, the Court must presume at this juncture that the state and local parameters would be exceeded if this sediment were to be discharged into Lake Erie. Forcing the State to permit the introduction of pollutants into Lake Erie in order to guarantee the continued navigability of the Cleveland Harbor is deleterious not only to Ohio but would clearly negatively affect the general public interest.

There has been no evidence of any harm to the public that would arise if the injunction is granted. The last three elements, therefore, also weigh strongly in favor of granting the Plaintiff's request for Preliminary Injunction. Consequently, the Court finds, based on the information currently before it, that the Plaintiff has a strong likelihood of success on the merits of the underlying case, and further finds that failure to issue the injunction could result in immediate and irreparable harm both to the State and to the general public.

## Conclusion

For all of the reasons set forth above, the factors the Court must consider in determining whether to grant an request for Preliminary Injunction weigh strongly in favor of granting the Preliminary Injunction requested by the Plaintiff. (ECF # 13). The Court, therefore, orders the Defendants to proceed with their original plan for dredging the Cleveland Harbor, "on or after May 15, 2015," including the Cuyahoga Navigational Channel or "sixth mile" as the parties have referred to it. (ECF #13-5). Further, the Corps is ordered to dispose of the dredging sediment in a Confined Disposal Facility and to pay all amounts required for such disposal. In its communications with the Court, the State agreed to allocate and reserve $423,050.00 for the cost of the Confined Disposal Facility, and $712,500.00 for the estimated material handling fees that may be incurred by the Corps in compliance with this order between now and 2017. They are, therefore, ordered to take steps to set aside $1,135,550 pending final resolution of this matter.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
United States District Judge

DATE May 12, 2015