**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| State of Ohio *ex rel*. Michael DeWine, | ) | CASE NO.: 15-CV-679 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| and | ) | |
| | ) | |
| Cleveland-Cuyahoga County Port Authority, | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Plaintiffs' Reply in Support of their |
| The United States Army Corps of | ) | Motion for Summary Judgment |
| Engineers, *et al.*, | ) | and Memorandum in Opposition to |
| | ) | Defendants' Motion for Summary |
| Defendants. | ) | Judgment |
| | ) | |

# Table of Contents

Introduction ................................................................................................................................ 1

I.      The Corps cannot trump national environmental law and policy with its preference for low-cost open-Lake disposal. ........................................................................................................... 2

II.     The Corps cannot ignore its Congressionally mandated duty to dredge. ...................................... 3

III.    The Corps cannot shortcut its own procedural regulations in properly determining the Federal Standard. .............................................................................................................................. 5

IV.     The Corps does not get to decide which of Ohio's water quality standards are applicable or how they should be interpreted. .................................................................................................... 8

V.      The Corps arbitrarily and capriciously violated the Clean Water Act in setting the Federal Standard without evaluating the Port's practicable disposal alternative. ...................................... 14

VI.     The Corps cannot deviate from established and published sediment evaluation manuals in favor of untested and experimental approaches. ................................................................................. 18

    A.  The Great Lakes Testing Manual prohibits open-Lake disposal. ............................................. 21

    B.  The Corps is prohibited from using the ASTM document or SESLEC guidance in place of the Great Lakes Testing Manual. .................................................................................................. 22

    C.  The Administrative Record indicates that CLA-1 biased the test results. ................................. 25

    D.  Ohio EPA's 2015 test results are properly part of the Administrative Record and before the Court. ................................................................................................................................. 26

    E.  To the degree the Ashtabula Harbor Evaluation is considered, it validates Plaintiffs' position, not the Corps'. ...................................................................................................................... 26

VII.    The Corps' selection of open-Lake disposal violated the National Environmental Policy Act and was arbitrary and capricious .................................................................................................... 27

    A.  The Record demonstrates the Corps did not take a "hard look" at the environmental impacts of open-Lake disposal because it did not consider the Port's CDF disposal alternative .............. 28

    B.  The Corps arbitrarily and capriciously concluded it did not need to complete an Environmental Impact Statement ................................................................................................................... 29

VIII.   The Corps predetermined its course of action and disregarded public input, applicable regulations, and sound science. ................................................................................................................... 31

Conclusion ............................................................................................................................... 35

## Table of Authorities

**Cases**

*Anglers of the Au Sable v. U.S. Forest Service*, 565 F. Supp.2d 812 (E.D. Mich. 2008) ....... 30, 31
*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................................................ 4, 19
*Chao v. Cmty. Trust Co.*, *474 F.3d 75* (3rd Cir. 2007), as amended (Mar. 7, 2007) ................... 10
*Clark Reg'l Med. Ctr. v. U.S. HHS*, 314 F.3d 241 (6th Cir. 2002) .............................................. 26
*Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp.2d 1156 (D. Ore. 2005) .......... 9
*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp.2d 1298 (S.D. Fla. 2005) ... 29, 31
*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) ......................................................... 7
*Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th Cir. 2013) ...................................... 26, 28, 31
*La. Pub. Serv. Com. v. FCC*, 476 U.S. 355 (1986) ........................................................................ 9
*Lake Pilots' Ass'n Inc. v. U.S. Coast Guard*, 2013 WL 5435048 (E.D. Mich. Sept. 30, 2013)... 26
*Luminant Generation Co. v. U.S. E.P.A.*, 675 F.3d 917 (5th Cir. 2012) ................................. 4, 19
*Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144 (1991) ....................... 10
*Meister v. U.S. Dept. of Ag.*, 623 F.3d 363 (6th Cir. 2010) ........................................................ 26
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) 10, 26
*NLRB v. Brown*, 380 U.S. 278 (1965) ......................................................................................... 28
*Ohio Coal Ass'n v. Perez*, 2016 US Dist LEXIS 78655 (S.D. Ohio June 16, 2016) ...................... 7
*Ohio Valley Envtl. Coalition v. Hurst*, 604 F. Supp.2d 860 (S.D. WVa. 2009) ........................... 31
*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 706 (1991) ....................................................... 9
*Sec'y of Labor, Mine Safety & Health Admin. v. Excel Mining, LLC*, 334 F.3d 1, 7 (D.C. Cir. 2003) ............................................................................................................................................ 10
*Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1998) .................................................................. 31
*Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152(10th Cir. 2002) ....... 14,16, 29
*Washington Market Co. v. Hoffman*, 101 U.S. 112 (1879) ............................................................ 9
*W. Oil & Gas Assn. v U.S. E.P.A.*, 633 F.2d 803 (9th Cir. 1980) .................................................. 7
*W. Watersheds Project v. U. S. Forest Serv.*, 535 F. Supp.2d 1173 (D.Ida. 2007) ..................... 35

**Statutes**

33 C.F.R. § 335-337 ....................................................................................................................... 5
33 C.F.R. § 335.7 ......................................................................................................................... 14
33 C.F.R. § 336.1 ............................................................................................................. 18, 19, 21
33 C.F.R. § 337.1 ........................................................................................................................... 5
33 C.F.R. § 337.2(b) ..................................................................................................................... 26
33 C.F.R. § 337.6 ....................................................................................................................... 6, 7
33 U.S.C. § 1323 ......................................................................................................................... 7,8
33 U.S.C. § 1341 ........................................................................................................................... 7
33 U.S.C. § 1251 ..................................................................................................................... 2, 17
33 U.S.C. § 1268 ........................................................................................................................... 2
33 U.S.C. § 2211(b)(1) .................................................................................................................. 9
33 U.S.C. § 426o-2 ..................................................................................................................... 3, 4
33 U.S.C. §§ 1313 .......................................................................................................................... 7
40 C.F.R. § 130.2 ......................................................................................................................... 11
40 C.F.R. § 1502.14(a) ................................................................................................................. 28
40 C.F.R. § 1508.27 ..................................................................................................................... 31
40 C.F.R. § 230.1(a) ..................................................................................................................... 18
40 C.F.R. Pt. 132, App. E.(A) ...................................................................................................... 12

42 U.S.C. § 4332(C) ................................................................................................ 30
43 U.S.C. § 1311 ....................................................................................................... 9
Ohio Admin. Code § 3745-1-05 ................................................................. 11, 12, 30
Ohio Admin. Code § 3745-1-26(E) ........................................................................ 11
Ohio Admin. Code § 3745-1-31 ............................................................................. 11

## Other Authorities

AR0000080 ............................................................................................................. 21
AR0000588-90 ....................................................................................................... 27
AR0000622-25 ....................................................................................................... 27
AR0000623 ............................................................................................................. 21
AR0000790 ............................................................................................................. 21
AR0001720 ............................................................................................................. 27
AR0003700 ................................................................................................. 21, 22, 25
AR0003707 ................................................................................................. 21, 22, 25
AR0003723 ..................................................................................................... 18, 21
AR0003755 ............................................................................................................. 12
AR0003829 ............................................................................................................. 20
AR0004267-76 ....................................................................................................... 12
AR0004278 ............................................................................................................. 26
AR0004499 ..................................................................................................... 21, 22
AR0004545 ............................................................................................................... 3
AR0004546 ............................................................................................................. 12
AR0004551 ................................................................................................. 19, 21, 27
AR0004556 ............................................................................................................. 12
AR0004592 ........................................................................................................... 3, 4
AR0004724 ........................................................................................................ 3, 4, 6
AR0004726 ............................................................................................................. 22
AR0004742 ............................................................................................................. 23
AR0004751 ............................................................................................................. 12
AR0004795 ............................................................................................................. 12
AR0005041 ............................................................................................................. 12
AR0005054 ........................................................................................................... 3, 4
AR0005058 ............................................................................................................. 17
AR0005089-90 ....................................................................................................... 23
AR0005100 ............................................................................................................. 12
AR0005131-57 ....................................................................................................... 17
AR0005535 ............................................................................................................. 29
AR0005614 ............................................................................................................... 6
AR0005641-48 ..................................................................................................... 3, 4
AR0005819 ............................................................................................................... 8
AR0005826 ............................................................................................................. 29
AR003722 ........................................................................................................... 5, 7
AR-SUPP0000001 ................................................................................................... 5
AR-SUPP0000049-269 ............................................................................................ 3
AR-SUPP0000058-59 .............................................................................................. 4
AR-SUPP0058535 ................................................................................................. 33
AR-SUPP0063851 ................................................................................................. 21

AR-SUPP0074500 ......................................................................................................... 13
AR-SUPP0079761 ......................................................................................................... 20
AR-SUPP0084547 ......................................................................................................... 33
AR-SUPP0092083 ......................................................................................................... 19
AR-SUPP0100031 ......................................................................................................... 13
AR-SUPP0101873 ......................................................................................................... 13
AR-SUPP0190154 ......................................................................................................... 34
AR-SUPP0190156 ......................................................................................................... 34
AR-SUPP0245799 ......................................................................................................... 20
AR-SUPP0248838 ......................................................................................................... 20
AR-SUPP0256464 ......................................................................................................... 27
AR-SUPP0288897 ............................................................................................... 18, 19, 21
AR-SUPP0288905-06 .......................................................................................... 18, 19, 21
AR-SUPP0289904 ......................................................................................................... 23
AR-SUPP0289998 ......................................................................................................... 32
AR-SUPP0290463 ......................................................................................................... 33
AR-SUPP0302002 ......................................................................................................... 24
AR-SUPP0305101 ......................................................................................................... 32
AR-SUPP0305170 ......................................................................................................... 19
AR-SUPP0305466 ......................................................................................................... 19
AR-SUPP0306503 ......................................................................................................... 19
AR-SUPP0306505 ......................................................................................................... 19
AR-SUPP0306579 ......................................................................................................... 19
AR-SUPP0307391 ......................................................................................................... 32
AR-SUPP0319786 ......................................................................................................... 33
AR-SUPP0320523 ......................................................................................................... 24
AR-SUPP0320658 ......................................................................................................... 33
AR-SUPP0321106 ......................................................................................................... 33
AR-SUPP0321311 ......................................................................................................... 33
AR-SUPP0349900 ......................................................................................................... 19
AR-SUPP0613030 ......................................................................................................... 34
AR-SUPP0629315 ......................................................................................................... 19
AR-SUPP0629397 ......................................................................................................... 32
AR-SUPP0629398 ......................................................................................................... 32
AR-SUPP0629402 ......................................................................................................... 20
AR-SUPP0630044 ...................................................................................................... 3, 32
AR-SUPP0630084 ........................................................................................................... 3
AR-SUPP0630093 ........................................................................................................... 3
AR-SUPP0630593 ........................................................................................................... 3
AR-SUPP0637897 ......................................................................................................... 34
AR-SUPP0642000 ............................................................................................... 13, 24, 33
AR-SUPP0642005 ......................................................................................................... 33
AR-SUPP0644645 ......................................................................................................... 35
AR-SUPP0675520 ......................................................................................................... 23
AR-SUPP0681293 ......................................................................................................... 21
AR-SUPP0681317 ......................................................................................................... 33
AR-SUPP0681361 ......................................................................................................... 33
AR-SUPP0822699 ......................................................................................................... 13

AR-SUPP1046213 ........................................................................................................... 33
AR-SUPP1061219 ........................................................................................................... 33
AR-SUPP1067933 ........................................................................................................... 34
AR-SUPP1067935 ........................................................................................................... 34
AR-SUPP1086688 ............................................................................................................. 3
AR-SUPP1157872 ..................................................................................................... 20, 24
AR-SUPP1158089 ........................................................................................................... 20
Doc. 101-1, pageID 9380 ................................................................................................ 25
Doc. 101-1, pageID 9382-83 .......................................................................................... 25
Doc. 101-1, pageID 9383-86 .......................................................................................... 23
Doc. 101-1, pageID 9383-93 .......................................................................................... 22
Doc. 101-1, pageID 9386-90 .......................................................................................... 24
Doc. 101-1, pageID 9440-44 .......................................................................................... 31
Doc. 104, pageID9485 .................................................................................................... 21
Doc. 104-1, pageID 9486, 88 ......................................................................................... 27
Doc. 104-1, pageID 9533-34 .......................................................................................... 25
Doc. 104-1, pageID 9539 ................................................................................................ 23
Doc. 104-1, pageID 9549 ................................................................................................ 28
Doc. 104-1, pageID 9546 ............................................................................................ 2, 30
Doc. 104-1, pageID 9500 ................................................................................................ 26
Doc. 104-1, PageID 9519 .................................................................................................. 6
Doc. 104-1, page ID 9551 ............................................................................................... 31
Doc. 104-1, pageID 9484 ................................................................................................ 22
Doc. 104-1, pageID 9492 ................................................................................................ 34
Doc. 104-1, pageID 9497 ................................................................................................ 35
Doc. 104-1, pageID 9498 ................................................................................................ 34
Doc. 104-1, pageID 9499 ................................................................................................ 24
Doc. 104-1, PageID 9506 .................................................................................................. 4
Doc. 104-1, pageID 9517 .................................................................................................. 5
Doc. 104-1, PageID 9517-18 ............................................................................................. 6
Doc. 104-1, pageID 9520 .................................................................................................. 8
Doc. 104-1, pageID 9520-24 ............................................................................................. 8
Doc. 104-1, pageID 9521 ............................................................................................... 8, 9
Doc. 104-1, pageID 9525 ........................................................................................... 18, 20
Doc. 104-1, pageID 9537 ................................................................................................ 13
Doc. 104-1, pageID 9538 ................................................................................................ 12
Doc. 104-1, pageID 9541 ................................................................................................ 24
Doc. 104-1, pageID 9544 ................................................................................................ 14
Doc. 104-1, pageID 9544-46 .......................................................................................... 14
Doc. 104-1, pageID9495 ................................................................................................. 32
Doc. 104-1, pageID9496 ................................................................................................. 32
Doc. 46, pageID 3162 ..................................................................................................... 11
Doc. 60, pageID 3306-3308 ........................................................................................... 26
Great Lakes Water Quality Agreement, Nov. 22, 1978, as amended by the Protocol signed Nov.
    18, 1987, U.S.–Can., Article II, 30 U.S.T. 1383 ...................................................... 2
PL 114-322, Dec. 16, 2016, 130 Stat 1628 ................................................................ 2, 30
45 Fed. Reg. 85336 ......................................................................................................... 22
53 Fed. Reg. 14902-01 .................................................................................................. 4, 8

60 Fed. Reg.15366-01 .................................................................................................... 13
H.R. REP. NO. 110-280.................................................................................................4, 9
S. REP. No. 95-370 ................................................................................................... 2, 30
S. REP. NO. 95-370 (1977) ......................................................................................... 4, 8

**Introduction**

After the Corps failed to appeal its Ohio Water Quality Certification, there was only one lawful and viable disposal method for dredged material from the 2015 Project: in a CDF. However, the Corps determined that it could save money by dumping the vast majority of the dredged material in Lake Erie.  To the Corps, the illegality of open-Lake disposal became irrelevant.  Because the Corps disagreed with Ohio's Water Quality Certification and had committed to open-Lake disposal, the Corps attempted to compel third parties to pay millions of dollars for legal CDF disposal or the Corps, in derogation of its statutory duties, was willing to cancel an essential (and already fully funded) dredging project, aware of the devastating consequences of that decision to the economy of Northeast Ohio.

To implement its predetermined plan, the Corps attempted to utilize "the Federal Standard," which, if appropriately applied, would allow the Corps to choose the lowest-cost option among the *environmentally acceptable* alternatives for dredged material disposal. However, for the 2015 Project, the Corps failed to properly adopt the Federal Standard both substantively and procedurally.  The Corps had predetermined that open-Lake disposal was the lowest cost method, and *then* contrived a record to claim open-Lake disposal was environmentally acceptable.  In so doing, the Corps deviated from published scientific manuals, its own published regulations and its Sampling and Analysis Plan, and ignored the Ohio water quality standards that would stand in its way.  Moreover, the procedure the Corps claimed it followed was contrary to its own administrative requirements and was conducted without meaningful public input.  The process used to arrive at the Federal Standard was contrived, inconsistent, and opaque—in other words, arbitrary and capricious.

The Court need not read between the lines.  The Record establishes that the Corps believes that national environmental law and policy are irrelevant; Congressional directives are suggestions; regulations are recommendations; Ohio's water quality standards are inapplicable or easily circumvented; published scientific manuals are optional; and public input is noise. Plaintiffs believe otherwise.  Therefore, Plaintiffs oppose Defendants' Cross-Motion for Summary Judgment and respectfully request that the Court Grant Summary Judgment in Plaintiffs' favor.

I.     **The Corps cannot trump national environmental law and policy with its preference for low-cost open-Lake disposal.**

In its Response and Cross Motion, the Corps uses the term "aspirational" no fewer than six times in attempt to minimize the importance of the explicit statutory goals of the Clean Water Act and other Federal laws:  "to end the open water disposal of dredge spoil" and eliminate the discharge of toxic pollutants into the Great Lakes.  Doc ID 104-1, pageID 9546; S. REP. NO. 95-370; 33 U.S.C. § 1251; *also see* Great Lakes Water Quality Agreement, Nov. 22, 1978, as amended by the Protocol signed Nov. 18, 1987, U.S.–Can., Article II, 30 U.S.T. 1383; 33 U.S.C. § 1268.  In 2016, Congress reaffirmed its direction again, stating:  "It is the sense of Congress that … open-water disposal of dredged material should be reduced to the maximum extent practicable." PL 114-322, Section 1189, December 16, 2016, 130 Stat 1628.[1]  Yet, the Corps has

---

[1]     Section 1189 of Public Law 114-322 is merely a clarification of existing law and does not change the law. 162 Cong. Rec. 177, H7488 (daily ed. Dec. 8, 2016)("section 1189 is simply a restatement of current law under the Clean Water Act"); House Committee on Transportation and Infrastructure, 114th Cong., Section-by-Section of S.612 Water Infrastructure Improvements for the Nation Act, at 13.  Accordingly, courts should apply Section 1189 retroactively. *Adventist Health System/Sunbelt v. Sebelius*, 715 F.3d 157, 164 (6th Cir. 2013) ("Since the [act] clarified rather than changed the law, there is no issue of retroactivity"); *Orr v. Hawk*, 156 F.3d 651, 654 (6th Cir. 1998) ("So long as a change in a regulation does not announce a new rule, but rather merely clarifies or codifies an existing policy, that regulation can apply retroactively.")

In fact, the Sixth Circuit has held clarifying legislation should be "accorded even greater weight." *Estate of McCoy v. Commissioner*, 809 F.2d 333, 338 (6th Cir. 1987) ("subsequent legislation declaring the intent of an earlier statute [even if passed by an earlier Congress] is entitled to significant consideration"), *citing NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 40 L. Ed.2d 134, 94 S. Ct. 1757 (1974) and *Bell v. New Jersey*, 461 U.S. 773, 784, 76 L. Ed.2d 312, 103 S. Ct. 2187 (1983).

been pursuing the exact opposite goal.  AR-SUPP0630084 ("Open lake disposal is certainly a priority for us in the Corps …."); AR-SUPP0630044 (the Corps' Buffalo District Office argues that open-lake disposal should be a priority);  AR-SUPP0630093;  AR-SUPP0630593; AR0004545 ("[V]irtually all other Ohio harbor dredged material is disposed of in Lake Erie.").

## II.    The Corps cannot ignore its Congressionally mandated duty to dredge.

The Corps had a duty to complete the 2015 Cleveland Harbor Dredging Project because the Project was indisputably necessary to support commercial navigation to authorized depths and the Corps had funds available to do so.  The duty imposed by 33 U.S.C. § 426o-2 is unambiguous and is supported by a clear legislative history—which the Corps does not address. The requirements of 33 U.S.C. § 426o-2 are specific and can be broken down as follows:  1) support commercial navigation; 2) to authorized depths; 3) at Great Lake's Harbors; and 4) with available funds.[2]

The Corps itself determined the need for the 2015 Project, the method to accomplish the 2015 Project, and that it had sufficient funds to accomplish the 2015 Project. AR0004724; *see generally* AR-SUPP0000049-269.  First, as stated numerous times in the Record, the Corps determined that the 2015 Project was necessary to support commercial navigation, as has been the case for decades. AR0004592; AR0005054; AR0005641-48.  Second, in its proposal for its 2015 Project, the Corps identified dredging as the method it would use to support commercial navigation at the Cleveland Harbor. AR0004724.  Third, the Corps defined the Project to be dredging to (and beyond) authorized depths. AR0004724.    Fourth, because Congress appropriated, and the Corps allotted, sufficient funds for the 2015 Project—including the full cost of CDF disposal—funding was available. AR-SUPP1086688.  Additionally, the timing of

---

[2] This obligation is only applicable to the sixty *commercial* harbors in the Great Lakes basin.

the 2015 Project was determined by the Corps, not Plaintiffs. AR-SUPP0000058-59; AR0004724. As a result, the statutory duty imposed by 33 U.S.C. § 426o-2 was triggered and the Corps had an obligation to complete the 2015 Project. A failure to complete the project—by the Corps' own analysis—would have caused the very harm that 33 U.S.C. § 426o-2 was enacted to avoid. H.R. REP. NO. 110-280; AR0004592; AR0005054; AR0005641-48.

Despite this unequivocal legislative history, the Corps attempts to say that there is no duty to dredge commercial harbors in the Great Lakes created by the words "expedite the operation and maintenance, ***including dredging***," (emphasis added).[3] The Corps cites to a dictionary definition of expedite, but conveniently passes over that very same dictionary's first listed definition of expedite: "To execute promptly." Doc. 104-1, pageID 9506; Merriam-Webster's Collegiate Dictionary (10th Ed. 2001).[4] And, in no dictionary is there any definition of "expedite" that says "don't do." Congress unambiguously ordered the Corps to execute maintenance dredging promptly, even if doing so meant additional costs to comply with state water quality standards. 33 U.S.C. § 426o-2; S. REP. NO. 95-370 (1977).

From a practical viewpoint, the Corps' arguments on this issue ignore that the Corps' threat not to dredge had nothing to do with the commercial navigational needs of the Harbor, the depth of the Harbor, the available funding for the Project, or the feasibility of the Project. *See* 53

---

[3] The Corps' interpretation of 33 U.S.C. § 426o-2 in its litigation brief is entitled to no *Chevron* deference and very little *Skidmore* deference. *Luminant Generation Co. v. U.S. E.P.A.*, 675 F.3d 917, 928 (5th Cir. 2012) (the level of *Skidmore* deference courts provide agency interpretations advanced for the first time in litigation briefs is "near indifference."); *N. Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 691 F.3d 735, 743 (6th Cir. 2012) (holding against Federal Agency after applying limited *Skidmore* deference); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 470 (1988) ("[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

[4] Even under its own interpretation, the Corps' actions with respect to the Cleveland Harbor dredging project violated 33 U.S.C. § 426o-2. According to the Corps, it was obligated to "speed up" or "to accelerate the process or progress" of "operation and maintenance, including dredging." Yet, the Corps took purposeful actions that hindered and delayed the operation and maintenance—specifically dredging—of the Cleveland Harbor. Notably, the Corps set a Federal Standard knowing that it would not be able to obtain a WQC and thus, would be (or would assert that it was) unable to fund legal disposal of dredged material, therefore it would refuse to dredge the Cleveland Harbor despite its obligation to expedite that work.

Fed. Reg. 14902-01 ("The need and justification for operations and maintenance work are made during the Army Civil Works annual Congressional budget review process."); AR0004724. Rather, the Corps' threat to defer dredging was based solely on its unfounded belief that its Federal Standard determination, although self-imposed, procedurally defective, and scientifically flawed, bound it to a course of action that even Assistant Secretary Darcy lacked discretion to alter. AR-SUPP0000001. The Corps' threat not to complete the 2015 Project was unlawful, arbitrary, and capricious. Therefore, the Court should grant Summary Judgment in Plaintiffs' favor.

### III.    The Corps cannot shortcut its own procedural regulations in properly determining the Federal Standard.

In their Motion for Summary Judgment, Plaintiffs establish that the Corps failed to follow their own procedures required to finalize a Federal Standard determination, citing to the Corps' internal policy for making Federal Standard determinations (AR003722). In violation of that internal policy—which itself cites to the Corps' regulations—the Corps failed to issue the final document required to make a final Federal Standard determination. Among other deficiencies, the Corps' failures to follow its procedures robbed Plaintiffs and the public of their right to know what the Corps was doing and the opportunity for full public involvement. In its Response, the Corps unavailingly asserts that it need not comply with its own policies specific to making a Federal Standard determination, and cites to regulations at 33 C.F.R. §§ 335-337. Doc. 104-1, pageID 9517.

The Corps, however, fares no better under 33 C.F.R. §§ 335-337 because the Corps failed to follow those regulations in the same way it failed to follow its internal policy: it did not allow for the public involvement those regulations require, and the Corps never even issued the final

document required by those regulations.  Pursuant to the Corps' regulations, before the Federal

Standard can be changed the Corps must provide for a public hearing:

> (1) A public notice providing opportunity for a public hearing should be issued at the earliest practicable time. The public notification procedures of § 337.1 of this chapter should be followed.
>
> (2) The public hearing procedures of 33 CFR part 327 should be followed.

33 C.F.R. § 337.1.  The evaluation process is concluded—after the public hearing and input—

with the issuance of a Statement of Findings.

> Upon completion of the evaluation process including required coordination, receipt or waiver of required state certifications, and completion of the appropriate environmental documents, [a Statement of Findings] will be prepared.

33 C.F.R. § 337.6.

The Corps *now* admits that its regulations require the Corps to provide public notice and

an opportunity for a public hearing when making a change to the Federal Standard. Doc. 104-1,

PageID 9517-18.  However, previously in this case, in the Corps' Response to Plaintiffs' Motion

to Complete the Record, without citing authority, the Corps argued that the State's issuance of its

Water Quality Certification (which required CDF disposal) mooted the Corps' public notice

process.  Doc. 64, pageID 4659; 33 C.F.R. § 337.6.

Recognizing now that public notice and comment are required, the Corps attempts to

claim that adequate public notice *was* given and a public hearing *was* held. Doc. 104-1, pageID

9519.  However, LTC Jansen's Memorandum for Record, supposedly setting the new Federal

Standard, was issued *the exact same day* public comments were due and was issued *two months*

*before* the Corps' public hearing. AR0004724; AR0005614.  This timing establishes that there

was no adequate public notice and comment prior to even the Corps' version of setting the

6

Federal Standard. In addition, the Corps admitted that it never completed a Statement of Findings, which is also required by their regulations. Doc. 64, pageID 4659.

Whether this Court judges the Corps' actions against its specified internal procedures or the identified regulatory requirements for making a Federal Standard determination, the result is the same: the Corps failed to comply. Were the Court to affirm the Corps' establishment of its claimed Federal Standard in this case, it would be sanctioning the Corps' action of making a Federal Standard determination in an unpublished internal memorandum maintained at the Corps' District Office, rather than in an official published document as is required by the Corps' regulations and policies. 33 C.F.R. § 337.6; AR003722. Interested parties would not know that the Corps was taking agency action to make a Federal Standard determination until after the final decision was made, at which point there would still be no official public notification of the change. Such secretive decision-making is even more reprehensible when the Corps then uses that decision to attempt to blackmail local parties into spending millions of dollars, as the Corps attempted in 2015. Doc 33, pageID 2458.

The Corps' actions in this case abrogate its own procedures, applicable regulations, and the Administrative Procedure Act.[5] Where a federal agency fails to provide notice and an opportunity to comment as required by law, such as the case here, such rules or regulations are invalid. *See W. Oil & Gas Assn. v U.S. E.P.A.*, 633 F.2d 803, 813 (9th Cir. 1980) ("Ordinarily a failure to comply with the APA requirements of prior notice and comment would invalidate such designations."); *Ohio Coal Ass'n v. Perez*, 2016 US Dist LEXIS 78655, *41 (S.D. Ohio June 16, 2016), citing *Iowa League of Cities v. E.P.A*, 711 F.3d 844, 873 (8th Cir. 2013) ("[n]otice and comment procedures secure the values of government transparency and public participation").

---

[5] A rule for the purposes of the APA is defined at 5 U.S.C. § 551(4) so broadly as to include virtually any statement an agency may make. *National Treasury Employees Union v. Reagan*, 685 F. Supp. 1346 (E.D. La. 1988).

The Corps' failures to follow its own policies and regulations for changing the Federal Standard are evidence that its decisions were unlawful, arbitrary, and capricious. This Court should not validate the Corps' failures and should grant Summary Judgment in Plaintiffs' favor.

## IV. The Corps does not get to decide which of Ohio's water quality standards are applicable or how they should be interpreted.

The Clean Water Act grants States the authority to set and enforce state water quality standards, applicable to private individuals and Federal agencies alike. 33 U.S.C. §§ 1313, 1323, 1341. Consistent with that authority, Ohio determined, through its 401 Water Quality Certification, that dumping dredged material from Cleveland Harbor into Lake Erie violates Ohio's water quality standards, making open-Lake disposal unlawful. AR0005819.

The Corps does not dispute the unlawfulness of open-Lake disposal without a State Water Quality Certification. Instead, it argues that the unlawfulness of a disposal alternative is irrelevant to what the Corps is attempting to frame as an internal budgetary decision. Doc. 104-1, pageID 9520-24. However, calling the Federal Standard determination an "internal budgetary determination" ignores both reality and the Corps' own regulations because a Federal Standard determination has nothing to do with financial project prioritization or cost-benefit analyses, which are determined during the Corps' Congressional budget review process. Doc. 104-1, pageID 9521; 53 Fed. Reg. 14902-01. As applied, this so-called "internal budgetary determination" serves no purpose other than to circumvent a state's Water Quality Certification. If the Corps disagrees with a state Water Quality Certification, it's so-called "internal budgetary determination" acts as a *de facto* veto, allowing the Corps to threaten to cancel funded Federal projects unless local parties pay for lawful disposal. In effect, this is nothing more than an attempt by the Corps to extort millions of dollars from States that choose to exercise their Federal right to protect water quality in a manner disagreeable to the Corps. 33 U.S.C. § 1323;

8

43 U.S.C. § 1311.  The Corps' mutilation of unambiguous Federal law creates a gridlock that

Congress clearly did not intend when it stated:

> Several corps district offices to date have requested and received funds to provide
> on land or confined disposal of dredge spoil. Pursuant to this amendment, **the
> corps may be required by the States in some instances to expend additional
> funds to protect water quality**. The committee supports funds for this purpose. It
> is the responsibility of the Secretary of the Army to seek such funds from the
> Congress….

S. REP. NO. 95-370 (1977) (emphasis added), or when Congress stated:

> The **Federal share** of the cost of operation and maintenance of each navigation
> project for a harbor or inland harbor constructed by the Secretary pursuant to this
> Act or any other law approved after November 17, 1986, **shall be 100 percent**.

33 U.S.C. § 2211(b)(1)(emphasis added), or when Congress stated:

> [33 USC § 426o-2] **directs** the Secretary, using available appropriated funds, to
> expedite the operation and maintenance, including dredging of the navigation
> features of the Great Lakes and Connecting Channels for the purpose of
> supporting commercial navigation to authorized project depths.

H.R. REP. NO. 110-280, 298 (Conf. Rep.)(emphasis added).  *Wash. Market Co. v. Hoffman*, 101

U.S. 112, 115-16 (1879) (noting that provisions of a statute should be read so as not to create a

conflict); *La. Pub. Serv. Com. v. FCC*, 476 U.S. 355, 372-73 (1986) (concluding, based in part

on Congressional intent, that a Federal statute did not provide FCC the power to pre-empt state

regulation of intrastate telecommunication rates); *Defs. of Wildlife v. Sec'y, U.S. Dep't of the

Interior*, 354 F. Supp.2d 1156, 1168-69 (D. Ore. 2005) (holding that Fish and Wildlife's

interpretation of the Endangered Species Act was unreasonable in part because the agency's

"interpretation runs counter to Congressional intent").

The simpler, unambiguous interpretation is correct:  the Corps' Federal Standard must be

compliant with U.S. EPA's 404(b)(1) regulations (undisputed), which require compliance with

Ohio's Water Quality Standards (undisputed), which Ohio determines (disputed by the Corps).

The primary question becomes: under U.S. EPA's 404(b)(1) regulations, does the Corps or Ohio determine compliance with Ohio's water quality standards?[6]  Therefore, the issue in dispute is not an interpretation of the Corps' regulations, but an interpretation of U.S. EPA's 404(b)(1) regulations, **for which the Corps receives no deference**. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 706 (1991) ("Nothing in our Chevron jurisprudence requires us to defer to one agency's interpretation of another agency's ambiguous regulations"); *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 154 (1991); *Sec'y of Labor, Mine Safety & Health Admin. v. Excel Mining, LLC,* 334 F.3d 1, 7 (D.C. Cir. 2003)( "[Courts] do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency."); *Chao v. Cmty. Trust Co.*, 474 F.3d 75, 85 (3rd Cir. 2007), as amended (Mar. 7, 2007).

Ohio determines compliance with its water quality standards using its Federally-derived authority.  As a consequence, whether harbors are dredged is directed by Congress through Corps project managers, based on financial prioritization and not by Corps ecologists passing judgment on state Water Quality Certifications.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").  Because Ohio determined open-Lake disposal would violate Ohio's water quality standards, open-Lake disposal is unlawful and inconsistent with U.S. EPA's 404(b)(1) regulations—and therefore not an environmentally acceptable alternative capable of being chosen as the Federal Standard, regardless of budgetary considerations.

---

[6] The Corps' Response does not address *this* question even though its regulations specifically require compliance with U.S. EPA's 404(b)(1) regulations. 33 C.F.R. § 335.7.  Instead, the Corps passes over this issue by attempting to morph compliance with U.S. EPA's 404(b)(1) regulations into an "internal budgetary decision." Doc. 104-1, pageID 9521.

However, regardless of who makes the determination, there is no rational, technical, or legal basis for claiming open-Lake disposal of the Cleveland Harbor sediment complies with Ohio's anti-degradation water quality standard.  Therefore, even if the Corps had authority to determine compliance with Ohio's water quality standards, the Corps was arbitrary and capricious in claiming that compliance.

Ohio's anti-degradation standards draw a very clear and very protective line for PCBs: *any* new loading of PCBs into Lake Erie constitutes a significant lowering of water quality. Ohio Admin. Code § 3745-1-05, which has been approved by U.S. EPA, provides:

> A significant lowering of water quality occurs when there is a new or increased loading of any bioaccumulative chemical of concern from any regulated existing or new facility, either point source or nonpoint source for which there is a control document or reviewable action including …
>
> deliberate activities that, based on the information available, could be reasonably expected to result in an increased loading of any bioaccumulative chemical of concern to any waters of the Great Lakes system.

U.S. EPA regulations regarding water quality standards define loading as follows:

> (e) Load or loading. An amount of matter or thermal energy that is introduced into a receiving water; to introduce matter or thermal energy into a receiving water….

40 C.F.R. § 130.2.  Read in conjunction with U.S. EPA's definition of loading, Ohio's water quality standard can be simplified as follows:  any increase in PCBs in Lake Erie from a deliberate activity constitutes a significant lowering of water quality.

There is no dispute that the Cleveland Harbor sediment contains PCBs. Doc. 46, pageID 3162 ("The Corps admits that 2012 sampling, 2013 evaluation, and 2014 sampling indicate that the DMMU sediment contains PCBs.").  Pursuant to Ohio's water quality standards, the Upper Cuyahoga Navigation Channel and Lake Erie are separate bodies of water with distinct designated uses and water quality criteria.  *Compare* OHIO ADMIN. CODE § 3745-1-26(E) *with*

11

OHIO ADMIN. CODE § 3745-1-31. Open-Lake disposal is a deliberate activity, which would increase the PCBs in Lake Erie. AR0005100 (Corps admitting that "[p]lacement of material dredged from DMMU-1 at CLA-1 may also result in a temporary negligible increase in the benthic bioaccumulation of PCBs."). Consequently, open-Lake disposal of the Cleveland Harbor sediment into Lake Erie would—by rule—constitute a significant lowering of water quality. Causing a significant lowering of water quality without approval from the Director violates Ohio's water quality standards.[7] Any claim otherwise by the Corps is without a legal or rational basis and demonstrates the Corps actually just ignored Ohio's anti-degradation standard as established by the Administrative Record and Plaintiffs' Motion for Summary Judgment. Doc. 101-1, pageID 9420-24.

The Corps' Response cites to documents in the Record where the Corps asserts that open-Lake disposal complies with Ohio anti-degradation standards, but those documents fail to actually *apply* Ohio's anti-degradation standards. Doc. 104-1, pageID 9538. Instead, the Corps attempts to justify open-Lake disposal alleging that it would not cause an *ecologically* unacceptable impact and therefore complies with Ohio's anti-degradation standards. AR0005041; Doc. 104-1, pageID 9538. The Corps completely misses the mark by ignoring the actual standard, which Ohio has explicitly and repeatedly explained to the Corps. AR0004267-76; AR0004546; AR0004751, AR0004795; *see* AR0003755; AR0004556; AR0005100.

The Corps cannot rewrite Ohio water quality standards in order to claim compliance. The Corps may think Ohio's standard is overly protective; however, not only is the Corps' opinion on this issue irrelevant, Ohio's standard is adopted directly from U.S. EPA's model standard for the Great Lakes. *Compare* 40 C.F.R. Pt. 132, App. E.(A) *with* OHIO ADMIN. CODE § 3745-1-05(F) as

---

[7] In some circumstances the Director could allow an entity to lower water quality. However, the Director could not and did not allow the Corps to lower Ohio's water quality in this case. OHIO ADMIN. CODE § 3745-32-03.

it relates to bioaccumulation.  In promulgating its model standard, U.S. EPA, recognized the unique nature of the Great Lakes and specifically addresses the importance of preventing the discharge of PCBs to the Great Lakes.

> The final Guidance also reflects the unique nature of the Great Lakes Basin Ecosystem by establishing special provisions for chemicals of concern …. The experience with such pollutants as … PCBs indicates that it takes many decades to overcome the damage to the ecosystem caused by even short-term discharges, and that prevention would have been dramatically less costly than clean-up.

Final Water Quality Guidance for the Great Lakes System, 60 Fed. Reg. 15366-01.[8]

The Corps simply did not adequately consider Ohio's anti-degradation standard as it claims. Doc. 104-1, pageID 9537.  Rather, the Corps actively attempted to circumvent it. AR-SUPP0074500 (Pickard stating that the Buffalo District "has become skilled in the unique area of critiquing state [water quality standards]"); AR-SUPP0642000 (Kozlowski instructing Pickard, "present why the anti-degradation doesn't apply to our final decision."); AR-SUPP0822699 (Pickard stating, "I suggest that there is no Ohio WQS for PCBs that applies in this case."); AR-SUPP0100031 (the Corps asserting Ohio's anti-degradation standard is inapplicable only two months before its claimed Federal Standard determination); AR-SUPP0101873.

If the Corps had followed Ohio's anti-degradation standard, it could only have reached one conclusion:  open-Lake disposal of the Cleveland Harbor sediment is prohibited.  By failing to actually consider and act consistent with Ohio's Federally enforceable anti-degradation standard the Corps acted arbitrarily and capriciously.  The Corps' attempt to make a Federal Standard determination with its (incorrect) interpretation of Ohio's water quality standards is arbitrary and capricious.  Therefore, the Court should grant Summary Judgment in Plaintiffs' favor.

---

[8] Both U.S. EPA's model rule and Ohio EPA's anti-degradation standard are consistent with national and international policy:  eliminating the discharge of PCBs into the Great Lakes.  Doc 101-1, pageID 9405-06.

**V.    The Corps arbitrarily and capriciously violated the Clean Water Act in setting the Federal Standard without evaluating the Port's practicable disposal alternative.**

As the Corps acknowledges, U.S. EPA's 404(b)(1) regulations prohibit the Corps from discharging dredged material if there is a "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a).  The Corps violated this requirement by setting the Federal Standard without evaluating the Port's CDF disposal Plan as a less-harmful alternative to open-Lake disposal.  The Corps erroneously claims the Port's Plan was not "practicable."[9]  Doc. 104-1, pageID 9520.

The Clean Water Act regulations define "practicable" as "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).  Alternatives are "available and capable of being done" if they are merely reasonable, not speculative, feasible or can **potentially meet the Agency's purpose**.  *See, e.g., Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1170 (10th Cir. 2002), *modified on other grounds*, 319 F.3d 1207 (10th Cir. 2003); *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng's*, 606 F. Supp.2d 121, 130 (D.D.C. 2009), *appeal dismissed*, 2009 U.S. App. LEXIS 29430 (D.C. Cir. July 1, 2009); *Bersani v. U.S. E.P.A,* 674 F. Supp. 405, 417 (N.D. N.Y. 1987), *aff'd*, 850 F.2d 36 (2nd Cir. 1988), *cert. denied*, 489 U.S. 1089 (1989).

The Corps' sole argument is that the Port's CDF disposal Plan was not "practicable" because the Port and the Corps had not *signed* the Section 217 Agreement. Doc. 104-1, pageID 9544-46.[10]   The Corps' argument ignores the meaning of practicable.  The Record is

---

[9] The Corps does not dispute that the Port's CDF disposal Plan had less impact on the aquatic ecosystem.

[10] The only document the Corps cites to argue the Port's Plan was not practicable is the Finding of No Significant Impact (FONSI) that the Plaintiffs argue was unlawful, arbitrary and capricious.  (Dkt #104-1, PgID 9550).  The

indisputable that the Port's CDF disposal Plan, approved by the Corps' highest ranking civilian official for Civil Works, was "available" and "capable of being done."  Given the evidence in the Record, it is disingenuous for the Corps to now claim that the very Plan it asked the Port to develop and the Plan it approved was not a "practicable" alternative.  The Record establishes the Port's Plan was a practicable alternative that the Corps should have evaluated before selecting open-Lake disposal:

- As the Corps admits, the Port worked with the Corps for five years (and invested $5 million) on a sediment disposal plan. Doc. 104-1, pageID 9544.  The Port initially proposed a long-term 20-year disposal plan (AR-SUPP1264682) and then accommodated the Corps' request to propose a short-term plan. AR-SUPP0435538.

- The Corps began working on a draft Memorandum of Agreement for the Section 217 Plan in June 2014.  AR-SUPP0872988.  The Corps stated "if [the short term decision document] is approved by [Jo-Ellen Darcy], USACE can move forward to negotiate a 217 Agreement with the Port Authority…this could take place in early 2015." AR-SUPP1195222.

- The Corps knew the Port was prepared to proceed with the Section 217 Agreement to provide tipping fees for the disposal Plan. AR-SUPP1257811.  The Port was merely waiting for the Corps to navigate its own approval process for the disposal Plan. AR0004534 (Mr. Friedman informing the Corps at a September 24, 2014 Dredge Task Force meeting "that the delay [regarding the 217 agreement] is not an engineering issue, it is the legal agreement").

- The Corps recommended and approved the Port's CDF disposal Plan *before* the Corps issued its Federal Standard determination of open-Lake disposal. AR-SUPP0026062-63; AR-SUPP00026064.[11]  The Corps admitted the Port's Plan was "achievable."  AR-SUPP0832139 (the Corps Director of Civil Works stating "[t]here is agreement in principle between the Buffalo District and the Port that such an arrangement is achievable").

---

flawed FONSI cannot act as validation for the Corps' failure to evaluate CDF disposal under 404(b)(1).  In fact, the flaws of the FONSI are highlighted by its failure to consider the countervailing facts listed above.

[11] The Corps' response to Sec. Darcy's letter arguing it did not approve a "plan" is nonsensical.  Doc 104-1, pageID 9545.  Darcy's letter specifically approved a 60-page disposal Plan titled "Dredged Material Management Plan and Environmental Assessment."  The Plan provided 1,000,000 cubic yards of CDF storage capacity.  The fact that the Plan provided CDF disposal for *all* dredged sediment for 4 years instead of 20 years (which was at the Corps' request) does not change that the Plan was a less-harmful and practicable alternative to open-Lake disposal.

- The Port budgeted $2 million for CDF disposal and confirmed to the Corps it had sufficient CDF capacity. AR0005852.

- The Corps touted the Port's CDF disposal Plan to the public and admitted it was the likely disposal plan before it selected open-Lake disposal. AR-SUPP0026063 (Secretary Darcy admitting CDF disposal is likely); AR-SUPP1227469 (COL Roemhildt, Corps' Commander of the Great Lakes and Ohio River Division, representing to Governor Kasich that the "approval [of the Port's Plan] by the Assistant Secretary for the Army for Civil Works represents significant progress toward the locally-preferred plan."); AR-SUPP1079941 (Jansen confirming the Port's CDF disposal Plan was consistent with the then-controlling Federal Standard);[12] AR-SUPP1195220 (Corps officials attending a June 25, 2014 Dredge Task Force Meeting in which the Task Force concluded "[a]t this time it appears that placement of the material in the CDFs…is the most likely option)."

- After Secretary Darcy's approval of the Port's sediment disposal Plan, the Port and the Corps began working on a draft Section 217 Agreement before the Corps selected open-Lake disposal. AR-SUPP0872988.

The Record citations above demonstrate the Port's Plan was reasonable, not speculative and could more than **potentially** meet the Corps' needs even where the Section 217 Agreement was not finalized and signed before the Corps selected open-Lake disposal.  Indeed the Port's disposal Plan was not simply capable of being done, the Port had begun implementing the Plan in 2015.[13]  Accordingly, the Port's CDF disposal Plan was "practicable," and the Corps' failure to evaluate this alternative in its 404(b)(1) analysis was arbitrary, capricious and in violation of the Clean Water Act.  *See Sierra Club v. Van Antwerp*, 362 Fed. Appx. 100, 106-107 (11th Cir. 2010) (concluding the Corps was arbitrary and capricious for failing to apply the presumption that practicable alternatives existed); *Utahns,* 305 F.3d at 1191 (finding the Corps' issuance of a

---

[12] The Corps' Response does not refute LTC Jansen's statement that the Port's Plan is consistent with the Federal Standard, but instead asserts the red-herring that "there was no viable alternative to beneficially use approximately 225,000 cubic yards of material to be dredged during the 2015 project."  Doc 104-1, pageID 9545.  The Port's CDF Plan involved a combination of several sediment management plans, not solely beneficial reuse, that provided capacity for all dredged sediments and thus the distinction in the Corps' Response is irrelevant.

[13] The Corps notes that a Section 217 agreement to this day has not been signed (Doc 104-1, PgID 9546, 9550). This is a representation that requires context for the Court.  Even without an executed Section 217 Agreement, the Port took actions consistent with its proposed disposal Plan in 2015.  The Port completed site improvements including sluiceways, containment berms and stockpile management areas.  It successfully received and managed over 60,000 cubic yard of dredged material, 50,000 cubic yards of which were beneficially reused.

permit under 404(b)(1) was arbitrary and capricious for failure to consider practicable alternatives); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp.2d 1298, 1331 (S.D. Fla. 2005) (finding the Corps' alternatives analysis improper)); *Hough v. Marsh*, 557 F. Supp. 74, 85 (D. Mass. 1982) ( determining the Corps did not clearly demonstrate that no feasible alternatives to filling wetlands existed).

Further, the Corps cannot rely on a feigned obligation under 33 U.S.C. § 419a to claim the Port's CDF Plan was not practicable or reasonable. AR0005058.  As the Court opined, "this statutory provision is not aimed at reclassifying potentially toxic sediment to avoid use of the CDFs, but rather seeks to develop methods of reducing or consolidating the volume of material disposed…." Doc.33, pageID 2456.  The Port's CDF Plan was consistent with 33 U.S.C. § 419a in that it provided a means to reduce the volume of dredged material stored in the CDF through dewatering, improving drainage, constructing dikes and beneficial reuse.  Nowhere does 33 U.S.C. § 419a enumerate that open-water disposal of sediments is an approved method for extending the life of the CDFs, and thus this requirement is not applicable here.

The disingenuousness of the Corps' argument against the Port's Plan is highlighted by the fact that the Corps' 404(b)(1) evaluation did not even mention, let alone evaluate, a single alternative to open-Lake disposal. AR0005131-57.  If "available" under 404(b)(1) means the very limited definition the Corps now argues (against all authorities)—that all legalities must be completed for an alternative to be "available"—then ironically, the Corps is admitting that its 404(b)(1) evaluation for its new Federal Standard was arbitrary, capricious and illegal.  The only alternatives the Corps evaluated (open-Lake disposal sites) were not "available" to the Corps because the State did not grant Water Quality Certification for open-Lake placement.  By solely examining open-Lake options, the Corps ignored the statutory mandate to evaluate practicable

alternatives with **less impact on the aquatic ecosystem**, 33 U.S.C. § 1344; 40 C.F.R. § 230.10(a), and violated the letter and the purpose of the Clean Water Act. *See* 33 U.S.C. § 1251(a) (the goal of the Clean Water Act is "restore and maintain the chemical, physical and biological integrity of the Nation's waters"); 40 C.F.R. § 230.1(a)("[t]the purpose of these Guidelines is to restore and maintain the chemical, physical and biological integrity of the waters of the United States through the control of discharges of dredged or fill material").

The Corps' failure to evaluate the practicable alternative of CDF disposal in the 404(b)(1) analysis was arbitrary, capricious and in violation of the Clean Water Act. Therefore, the Court should grant Summary Judgment in Plaintiffs' favor.

## VI.     The Corps cannot deviate from established and published sediment evaluation manuals in favor of untested and experimental approaches.

When performing a sediment evaluation, pursuant to the Corps' regulations, the Corps must follow the most current *published* testing manual:

> If the district engineer determines the dredged material to be contaminated, he will follow the guidance provided in the most current published version of the technical manual for contaminant testing and controls.[14]

33 C.F.R. § 336.1. The most recent published testing manual applicable to the Cleveland Harbor sediment is the Great Lakes Testing Manual (GLTM), which is used in conjunction with the Corps' generic manual, the Inland Testing Manual (ITM). *See* AR0003723; AR-SUPP0288897; AR-SUPP0288905-06. Therefore, while the ITM contains language stating that it is non-binding, the Corps' *regulations* provide that it must follow the most recently published manual

---

[14] The Corps' regulations at 33 C.F.R. § 336.1(b)(8) provide a similar requirement for developing tests for state Water Quality Certification applications:

> If the proposed disposal activity may violate state water quality standards, after consideration of disposal site dilution and dispersion, the district engineer will work with the state to acquire data to satisfy compliance with the state water quality standards. **The district engineer will use the technical manual** "Management Strategy for Disposal of Dredged Material: Contaminant Testing and Controls" **or its appropriate updated version** as a guide for developing the appropriate tests to be conducted on such dredged material.

18

(the GLTM). 33 C.F.R. § 336.1.  The Corps argues that it is under no obligation to follow any testing manual, citing a string of cases.  Doc. 104-1, pageID 9525.  Those cases are easily distinguished because here, rather than in any of those cases, applicable regulations require use of the Manual in question—the GLTM. 33 C.F.R. § 336.1.  And here, rather than in any of those cases, the Corps affirmatively represented to Plaintiffs that it would perform its evaluation pursuant to the GLTM and ITM as has been the Corps' historic practice. AR-SUPP0288897; AR-SUPP0288905-06; AR0004551.

Specifically, the Corps' published Sampling and Analysis Plan (for the sediment sampling evaluated for the 2015 Project) stated that the Corps would follow the GLTM (in conjunction with the ITM). AR-SUPP0288897; AR-SUPP0288905-06 ("[t]he sediment samples will be collected, analyzed, and evaluated in accordance with the protocols and guidelines contained in the GLTM and/or the ITM."). To change evaluation methodologies midway through the process and without notice is arbitrary and capricious.

It was only after Pickard predicted that the PCB bioaccumulation results from the Harbor sediment would exceed the Lake sediment results (and therefore fail the GLTM standard), that he suggested applying the draft "emerging" guidance. AR-SUPP0306579; AR-SUPP0306505; AR-SUPP0306503; AR-SUPP0305466.  Before, throughout, and after the evaluation, Pickard recognized that using the draft guidance was a change in approach from the protocols of the GLTM and ITM. AR-SUPP0092083; AR-SUPP0305170 (Pickard stating, "[W]e will very likely need to use the emerging 'informal' Federal guidelines … we are navigating some uncharted territory in this case"); AR-SUPP0349900 (Pickard stating, "[W]e will need to apply 'emerging' Federal guidance (informal) that may or may not be interpreted to be covered under existing Federal guidance."); AR-SUPP0629315 (Pickard stating, "We … are the first in [the Corps] to

apply this new 'conceptual site model' approach, it's not a typical Tiered Evaluation…."); AR-SUPP1158089 (Pickard stating, "[t]he Federal Standard determination for Cleveland Harbor … does include some 'untested' approaches…."); AR-SUPP1157872 (Pickard, after completing his evaluation stating, "I'm not sure why this evaluation isn't being directly coordinated with OEPA by one of us 'tech folks,' which is standard practice, particularly since we are 'breaking new ground' in this particular case.").  As cited above, Pickard states a *need* to use the draft guidance. However, this *need* arises only because the appropriate methods would not justify the predetermined result of open-Lake disposal.

The Corps argues it can simply do whatever it wants and there is no requirement to follow *any* particular evaluation methodology or procedure. Doc. 104-1, pageID 9525.  If true, the evaluation process would lack transparency, consistency, and accountability, which is exactly the case with the Corps' Cleveland Harbor sediment evaluation. AR-SUPP0245799 (Pickard stating, "I am convinced that the three GL Districts are evaluating sediments differently (Cleveland will be a very good example …)"); AR-SUPP0248838 (Pickard acknowledging, "I'm certain the other [Great Lakes] Districts would have come up with significantly different conclusions.");  AR-SUPP0079761 ("I suggest that [the other Great Lakes Districts] would have concluded that this dredged material does not meet Federal guidelines for open-lake placement."); AR-SUPP0629402 (Pickard stating, "we are breaking new ground here, and that process involves a number of inherent uncertainties."); AR0003829 ("[T]he draft guidance [that Pickard uses]… can't be released because it hasn't undergone formal internal USACE review or been formally coordinated with USEPA.").

The Corps' deviations from the GLTM are inconsistent with the Corps' regulations, the Corps' initial representations to Plaintiffs, the Corps' original Sampling and Analysis Plan, the

Corps' past practices, and the Corps' own internal policies. 33 C.F.R. § 336.1; AR-SUPP0063851; AR-SUPP0288897; AR-SUPP0288905-06; AR0004551; AR0003723. Accordingly, the Federal Standard allegedly based upon this sediment evaluation is arbitrary, capricious and unlawful. Therefore, the Court should grant Summary Judgment in Plaintiffs' favor.

      **A.     The Great Lakes Testing Manual prohibits open-Lake disposal.**

      The GLTM prohibits open-Lake disposal of the Cleveland Harbor sediment. To evaluate PCB bioaccumulation, the GLTM provides a clear standard: statistically significant increases in PCB bioaccumulation are environmentally unacceptable. No scientific "leap" is needed to reach this clear conclusion as the Corps asserts. Doc 104, pageID9485. The Corps' Response fails to acknowledge that the GLTM *twice* states this PCB bioaccumulation standard—the first time speaks directly to compliance with U.S. EPA's 404(b)(1) regulations, and the second time speaks directly to ecological significance. AR0000623; AR0000790 ("IF the contaminant concentrations in the tissue exposed to the dredged material is statistically greater than that of tissue exposed to disposal site material, THEN the dredged material would have **unacceptable adverse impacts** on benthos.") (emphasis added, caps in original); AR-SUPP0681293. The result is the same under the ITM because it instructs the Corps to use the GLTM to make determinations related to PCB bioaccumulation. AR0000080.

      Here, the PCB bioaccumulation results from all three DMMUs were greater than the results from CLA-1: DMMU-1 (representing 50% of the sediment by volume) was statistically greater, and DMMU-2a & 2b (representing the other 50%) were numerically greater (but not statistically). AR0003700; AR0003707; AR0004499. Contrary to the Corps' assertions, Plaintiffs make no concession regarding open-Lake disposal of any of the sediment. Doc. 104-1,

pageID 9484.  First, the Corps never officially proposed to segregate the DMMUs for disposal in this Project, so it is unclear how partial (50%) compliance would be relevant.[15] AR0004726; *see also* AR0004499.  Second, the Corps' reasoning ignores the presumption established by U.S. EPA's 404(b)(1) regulations, and consistent with Congressional intent, against open-Lake discharge. 40 C.F.R. § 230.10; 45 Fed. Reg. 85336 ("[U.S. EPA] … retained the presumption against discharge ….").  Therefore, the Corps' attempt to claim after-the-fact justification for some portion of the sediment is entirely unavailing.

More importantly, however, when (appropriately) compared to the non-impacted reference sediment location (CLA-4), *all* Cleveland Harbor segments had numerically **and** statistically greater PCB bioaccumulation results. AR0003700; AR0003707.  Therefore, using the appropriate Manual and the appropriate reference sediment, none of the sediment from any part of the sixth mile could be approved for dumping in the Lake. *See* AR-SUPP0079761.  Instead of reaching the result required by its established Manual, the Corps surreptitiously applied unverified, emerging guidance.

### B.  The Corps is prohibited from using the ASTM document or SESLEC guidance in place of the Great Lakes Testing Manual.

Plaintiffs' Motion for Summary Judgment cited to numerous Corps emails that illustrate the problem with using unpublished evaluation methods (*i.e.*, disagreement on approach, methods are subject to change, methods have no defined endpoints, methods can be changed to obtain desired results). *See* Doc 101-1, pageID 9383-93.  The Corps selectively picked two methods from its emerging guidance (ASTM and SESLEC) and selectively applied them to the Cleveland Harbor.  Not only does this violate U.S. EPA and Corps regulations, it demonstrates

---

[15] Internally, it seems that the Corps considered this course of action, but the 2015 Project did not propose any segregation of the DMMUs. AR-SUPP0256464.

the Corps' result-originated decision making, and is an arbitrary, capricious, and unlawful way of performing evaluations.

The ASTM standard the Corps applied to Cleveland Harbor was new, subject to disagreement, and was being debated even *after* the evaluation had ended. *See* Doc 101-1, pageID 9383-86. Whether the Corps applied the ASTM correctly or not, these emails demonstrate that the Corps was searching for ways to approve open-Lake disposal rather than using the required applicable methods, applying the presumption against discharge of toxics, or performing an objective evaluation. This not only lacks transparency and consistency, it is contrary to law. These problems do not occur if the Corps follows only established and published standards, as required.

The Corps claims the SESLEC model was only applied to the CLA-4 sediment, but the Record indicates that the Corps used SESLEC to justify open-Lake disposal at both CLA-1 *and* CLA-4.[16] AR0004742; AR-SUPP0675520; Doc 104-1, pageID 9539 at fn.34; AR0005089-90. What is slightly confusing—but revealing—is that **the Corps used a comparison to the CLA-4 sediment data in SESLEC to justify open-Lake disposal at *both* CLA-1 and CLA-4**. AR-SUPP0675520 (Pickard stating that the CLA-1 sediment is too contaminated to use in the SESLEC model so he is using the CLA-4 data); AR-SUPP0289904; AR0004742; Doc 104-1, pageID 9539 at fn. 34; AR0005040; AR0005089-90. By comparing the Harbor sediment to CLA-4 sediment, the Corps then concluded that disposal at CLA-1 was appropriate, as a second line of evidence. AR-SUPP0675520; AR-SUPP0289904; AR0004742; Doc 104-1, pageID 9528 at fn.29, pageID 9539 at fn. 34; AR0005089-90. The Corps cannot criticize Plaintiffs' demonstration of the Corps' inappropriate use of SESLEC now because the Corps' own

---

[16] Also, the Corps' claimed Federal Standard determination refers to both CLA-1 and CLA-4 in justification of its conclusion regarding open-Lake disposal. AR0005040.

Sediment Evaluation Team specifically cited to the Corps' use of SESLEC as a justification for the Corps' December 17, 2014 conceptual Federal Standard determination. AR0004742; AR0005040.

The Record establishes that, in addition to improperly using SESLEC, the Corps altered the emerging guidance that contained SESLEC. Now the Corps wants the Court to ignore Pickard's alteration claiming that Pickard did not alter SESLEC per se. Doc. 104-1, pageID 9499. The Corps is playing games with semantics. Pickard made a change to the emerging guidance because, as written, open-Lake disposal could not be justified with SESLEC. Doc 101-1, pageID 9386-90; AR-SUPP0302002(Indicating that the section Pickard eventually altered is necessary for evaluations under the emerging guidance). The actual name of the section that Pickard altered is immaterial. The alteration itself demonstrates the bias and predetermination in this case, and the problems with using unpublished, unsanctioned guidance generally.

The Corps claims that SESLEC was not secret because the Corps described it in part in its 2013 evaluation. Doc. 104-1, pageID 9541 (claiming the Corps "explained its SESLEC methodology … the *very first chance it got*: the 2013 sediment evaluation…." Doc. 104-1, pageID 9541 (emphasis added). This is incorrect. AR-SUPP0320523 (Pickard in 2013 discussing why he is not coordinating with Ohio regarding use of the draft guidance); AR-SUPP1157872. If the Corps were properly attempting to utilize SESLEC, the Corps could have and should have identified SESLEC as a potential evaluation methodology *before* collecting sediment samples and definitely *before* performing the evaluation. For example, the Corps could have done this in its Sediment Analysis and Evaluation Plan. Additionally, by the time the Corps disclosed a portion of its draft guidance in March 2014, the Corps was already committed to defending its decision. AR-SUPP0642000 (Pickard in March of 2014 being informed what he

needed to do for the Corps "to continue having [a] firm position to move toward Open lake placement."). Again, these problems would not have occurred if the established and published test methods had been used, as required.

C.  The Administrative Record indicates that CLA-1 biased the test results.

Plaintiffs are not asking the Court to make scientific determinations with regard to CLA-1. Rather, Plaintiffs ask the Court to view the Corps' use and justification of the contaminated CLA-1 sediment in context with the well-documented predetermination and other deviations from established methods. The Corps dismissed recognized indications that CLA-1 was too contaminated to use as a comparison sediment and sought only to justify its predetermined result of open-Lake disposal. The Corps arbitrarily and capriciously fails to give any acceptable explanation for using a highly polluted portion of Lake Erie with documented petroleum contamination to justify open-Lake disposal in derogation of the requirements of the GLTM. Doc 101-1, pageID 9380-83; *See Ky. Riverkeeper v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2012) ("An agency's decision is arbitrary and capricious when the agency … entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency"); *Meister v. U.S. Dept. of Ag.,* 623 F.3d 363, 377 (6th Cir. 2010); *Clark Reg'l Med. Ctr. v. U.S. HHS*, 314 F.3d 241, 247 (6th Cir. 2002).

The Corps' Response fails to offer an explanation for the high *PCB bioaccumulation* results at CLA-1. Doc 104-1, pageID 9533-34. Instead, the Corps' "evidence" primarily focuses on sediment migration and toxicity. Doc 104-1, pageID 9533-34. The Corps' claim that "concentrations of PCBs at CLA-1 as compared to other areas in Lake Erie [were similar]" only proves Plaintiffs point because while the *PCB concentrations* were similar between CLA-1 and CLA-4, the *PCB bioaccumulation* was much higher at CLA-1. Doc 104-1, pageID 9533-34;

AR0003700; AR0003707; Doc 101-1, pageID 9380-83; *see also* AR-SUPP0256464.  Therefore, the Corps' sediment evaluation and consequently its Federal Standard determination were arbitrary and capricious and the Court should grant Summary Judgment in Plaintiffs' favor.

**D.     Ohio EPA's 2015 test results are properly part of the Administrative Record and before the Court.**

Ohio EPA's PCB bioaccumulation results were obtained and finalized *after* litigation was filed.  Plaintiffs intended no misrepresentation and apologize for any misstatement or misunderstanding. Doc. 104-1, pageID 9500.  Plaintiffs' Motion to Complete the Record sought inclusion of these data to provide additional context necessary for effective judicial review. Doc. 60 pageID 3306-3308.  The Court granted that Motion so these data are before the Court.  The question only remains how they may be used.  These data were not included to contradict the Corps' data because the same conclusion should be reached with either data set.

The Corps had an obligation to "accommodate [Ohio's] concerns to the extent practicable." 33 C.F.R. §§ 337.2(b), 336.1(b)(8).  In August of 2014, LTC Jansen suggested delaying any Federal Standard determination until after Ohio's testing recommendations were addressed. AR0004278.  These data provide the context for what information would have been available if the Corps had followed LTC Jansen's recommendation.  As argued in Plaintiffs' Motion for Summary Judgment, the data *reconfirm* the conclusions that the Corps' 2012 data already established—namely that open-Lake disposal cannot be justified.

**E.     To the degree the Ashtabula Harbor evaluation is considered, it validates Plaintiffs' position, not the Corps' position.**

The Corps argues that Ohio's previous decisions regarding disposal of sediment from Ashtabula Harbor somehow justify open-Lake disposal of sediment from Cleveland Harbor. Doc 104-1, pageID 9486, 88.  However, Cleveland is neither Ashtabula nor any other harbor where

open-Lake disposal might be permitted.  The Ashtabula Harbor data are different than Cleveland Harbor data and were properly evaluated, therefore, Ohio reached different conclusions. AR0004551.

After applying the proper manual and procedures, the Corps and the State approved only the Ashtabula Harbor sediments that did *not* evidence an increase in PCB bioaccumulation for open-Lake disposal. *See also*, AR-SUPP0256464 (Lenox in 2013 stating, "DMMU-1 measured tissue concentrations are actually very similar to the Ashtabula management unit [that was] determined to require confinement.").  Contrary to its evaluation of the Cleveland Harbor sediment, the Corps evaluated the Ashtabula Harbor sediment in strict compliance with the tiered analysis provisions of the GLTM (*i.e.*, without applying any untested, emerging guidance). AR0001706; See AR0004551; AR0000588-90, AR0000622-25.   All sediments approved for open-Lake disposal from Ashtabula Harbor passed the Tier 3 analysis required by the GLTM, **and sediments which showed a statistically-significant increase in PCB bioaccumulation were judged by the Corps not to meet the Federal guidelines for open-Lake placement.** AR0001720.

The reason for the discrepancy in results is not inconsistency by the State; rather, it is the Corps' inconsistency.  The GLTM gave the Corps the answer it wanted for Ashtabula Harbor. When it did not for Cleveland, the Corps arbitrarily, capriciously, and unlawfully sought other methods to justify its predetermined decision.  In contrast, the State followed the applicable Manual and allowed open-Lake disposal when it was properly applied.

**VII.    The Corps' selection of open-Lake disposal violated the National Environmental Policy Act and was arbitrary and capricious.**

The Corps does not have unbridled discretion under NEPA.  NEPA requires the Corps to take a "hard look" at the environmental consequences of open-Lake disposal.  *Ky. Riverkeeper,*

*Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013).  The Record verifies that the Corps' failure to evaluate the Port's CDF disposal alternative was not rational and that the Corps' failure to prepare an EIS for open-Lake disposal, a new action that departed from nearly 45 years of CDF disposal history, was arbitrary, capricious and in violation of NEPA.

A.    **The Record demonstrates the Corps did not take a "hard look" at the environmental impacts of open-Lake disposal because it did not consider the Port's CDF disposal alternative.**

As the Corps acknowledges, NEPA requires that the Corps evaluate a "reasonable range" of alternatives. Doc 104-1, pageID 9549; 40 C.F.R. § 1502.14(a).  The Corps' Environmental Assessment (EA), even if the appropriate tool (which it was not), merely analyzed (1) no action and (2) open-Lake disposal sites (CLA-1 and CLA-4).  The Corps' scant alternatives analysis does not fulfill NEPA's mandate to assess a "reasonable range" of alternatives.  The Corps' alternatives involved a choice between no dredging (leading to catastrophic economic harm) and open-Lake disposal (the environmentally harmful alternative that Ohio did not approve).  It was arbitrary and capricious for the Corps to set aside a lawful, reasonable alternative that provided a balance between economic harm and environmental harm.  The Port's environmentally sound and Corps-approved CDF disposal Plan was well within the "reasonable range" of alternatives that NEPA required the Corps to consider. *See Utahns for Better Transportation, at* 305 F.3d at 1171 (finding the agency violated NEPA for failing to evaluate several alternatives including a public transit expansion to alleviate the immediacy of the need for a highway development project); *Fla. Wildlife Fed'n*, 401 F. Supp.2d at 1333 (finding the Corps' Environmental Assessment critically deficient because its alternatives and benefits analysis did not match the scope of its impact analysis).

Other Federal agencies also concluded the Corps' evaluation of alternatives was deficient. Specifically, U.S. EPA informed the Corps that its Environmental Assessment improperly overlooked the Port's CDF disposal alternative. AR0005826. And, the U.S. Fish & Wildlife Service provided comments requesting that the Corps examine alternatives to open-Lake disposal. AR0005535.

In addition, the Port's CDF disposal Plan was reasonable and practicable. (*See supra* pages 14-18). It was approved by the Corps' highest ranking civilian official for Civil Works, the Corps had funding for CDF disposal, the Port had invested significant funds in the disposal Plan, and the Port began implementing the Plan.[17] The Corps' failure to include and evaluate the Port's reasonable CDF disposal Plan as an alternative to open-Lake disposal violated NEPA and was arbitrary and capricious.

### B. The Corps arbitrarily and capriciously concluded it did not need to complete an Environmental Impact Statement (EIS).

The Record confirms the Corps unlawfully issued a Finding of No Significant Impact (FONSI) after it completed the EA. NEPA requires Federal agencies to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In challenging a FONSI, "a plaintiff need not show that significant effects will **in fact** occur; raising substantial questions whether a project **may have** a significant effect is sufficient." *Anglers of the Au Sable v. U.S. Forest Service*, 565 F. Supp.2d 812, 825 (E.D. Mich. 2008)(emphasis added). Plaintiffs have demonstrated, and the Record verifies, open-Lake disposal would significantly affect the environment.

---

[17] Plaintiffs demonstrate the Corps' selection of open-Lake disposal as the Federal Standard is arbitrary and capricious—thus the Corps cannot rely on the flawed Federal Standard determination as support for its FONSI. Further, the Corps' EA and FONSI inappropriately narrowed the analysis to evaluate the "selection of a site for open-lake placement of material dredged from the Upper Cuyahoga River Channel of the Cleveland Harbor." The Corps' defined scope cannot serve to foreclose the consideration of reasonable alternatives as required by NEPA. *Davis v. Mineta*, 302 F.3d 1104, 1118-19 (10th Cir. 2002).

For one, Congress itself determined that open-Lake disposal could have a significant impact on the environment.  33 U.S.C. § 1251; S. Rep. 95-370 (the CWA goal was "to end the open water disposal of dredge spoil").  Congress recently reaffirmed this goal by passing the WIIN Act mandating that "open water disposal of dredged material should be reduced to the maximum extent practicable."  PL 114-322, Section 1189, Dec. 16, 2016, 130 Stat 1628.  In addition, Ohio law provides that *any* new loading of PCBs into Lake Erie is significant.  OHIO ADMIN. CODE § 3745-1-05.  *See also* Doc 101-1, pageID 9405-06 (citing national and international policy supporting the elimination of the discharge of PCBs into the Great Lakes). The Corps' EA arbitrarily ignored State, national, and international laws and policies and instead selected open-Lake disposal.

In addition, as outlined in Plaintiffs' Motion for Summary Judgment (Doc. 101-1, pageID 9440-44), the "intensity" factors require the Corps to conduct an EIS. 40 C.F.R. § 1508.27.  The "size, nature and effect" of the open-Lake disposal and the cumulative impacts of open-Lake disposal of persistent toxics both mandate an EIS. *Anglers of the Au Sable,* 565 F. Supp.2d at 827.  Although the Corps argues "the mere presence of enumerated intensity factors does not mandate a finding of significance," (Doc. 104-1, page ID 9551), numerous cases invalidate an agency's NEPA decision for failure to meet even a single "intensity" factor.  *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 408 (6th Cir. 2013) (finding the EA arbitrary and capricious for failure to identify any cumulative impact of past actions); *Anglers of the Au Sable,* 565 F. Supp.2d at 827 (concluding "[t]he presence of controversy or uncertainty will often lead courts to require a full-blown EIS"); *Ohio Valley Envtl. Coalition v. Hurst*, 604 F. Supp.2d 860, 884 (S.D. WVa. 2009) (concluding "the Corps' decision not to prepare an EIS was arbitrary and capricious for its failure to consider the cumulative impacts of past actions and its conclusory

cumulative impacts analysis); *Fla. Wildlife Fed'n,* 401 F. Supp.2d at 1333 ("by failing to adequately examine the reasonably foreseeable indirect and cumulative effects of the proposed project, the Corps failed to take the requisite 'hard look' at all relevant environmental concerns"); *Stewart v. Potts*, 996 F. Supp. 668, 684 (S.D. Tex. 1998) (even "under a narrow standard of NEPA review," the court concluded the Corps' Environmental Assessment failed to take a "hard look" at cumulative impacts of the proposed project).  Accordingly, the Corps was arbitrary and capricious for failing to complete an EIS and the Court should grant Summary Judgment in Plaintiffs' favor.

**VIII.  The Corps predetermined its course of action and disregarded public input, applicable regulations, and sound science.**

The Corps accuses Plaintiffs of omitting context in its recounting of the Corps' predetermination.[18]  Doc. 104-1, pageID 9495.  Providing additional context, however, only further demonstrates the egregiousness of the Corps' conduct.  For instance, the Corps is quick to point out that after Cleveland Harbor Project Manager, Michael Asquith, stated that it was the Corps' "primary objective to allow open-lake placement in Cleveland by 2013," Pickard suggested that Asquith rephrase that statement.  Doc. 104-1, pageID 9496.  However, Pickard's suggestion doesn't signify a change of purpose; rather, it merely demonstrates the Corps' strategy to keep its true objective secret.  The revealing aspect of Asquith's email is not what was ultimately conveyed to external sources, but that the Corps' Cleveland Harbor Project Manager believed the primary objective was open-Lake disposal.

Other examples in the Record demonstrate that the Corps' actual goal at the Cleveland Harbor was always open-Lake disposal. AR-SUPP0305101 (Pickard in 2012, "we are moving forward with open-lake placement at Cleveland Harbor."); AR-SUPP0289998 (Pickard in 2012,

---

[18] This accusation further confirms the Corps' lack of transparency associated with this project.  Notably, Plaintiffs had to obtain this Court's Order to access the full Administrative Record.

the sampling analysis plan is "supposed to pursue open-lake placement at a specific designated area"); AR-SUPP0307391; AR-SUPP0629398 (O'Connor in 2013, before the sediment evaluation was complete, discussing "[t]he goal of open lake placement" and stating "[f]or planning purposes, I will direct the Team to assume 80% of dredged sediment meets open lake guidelines after 2018."); AR-SUPP0629397 (Pickard in 2013, "I don't think a goal of open-lake placement is at all unrealistic in 2013."); AR-SUPP0630044 (Pickard discussing how open-Lake disposal is a primary "overarching regional need.").

Even before sampling in 2012, the Corps had dismissed the Port's recommendations and technical comments.  The Buffalo District's Chief of Operations, Josh Feldman, asked Asquith, "Are we responding to [the Port's comments on the sampling plan]? I honestly think we should. We so often turn the other cheek with these clowns." AR-SUPP0058535.  To which Asquith answered, "Not responding is the best way to marginalize these comments instead of engaging in the nonsense." AR-SUPP0058535; *see also* AR-SUPP0290463 (Asquith in March 2012, suggesting not sending the sampling plan to the Port in the first place).

Later, in May of 2013, when the Port observed that the Corps was not sharing information, Buffalo District Management said that the Port's CEO, "Will [Freidman] was a jacka$$" for complaining about communication problems. AR-SUPP1046213; AR-SUPP1061219. The Buffalo District's Deputy District Engineer, David Romano, responded— before the sediment evaluation was even complete—that "[the Corps] should go pencils down until we get a sponsor." AR-SUPP1046213. Therefore, before the sediment evaluation was even complete, the Corps was focused on coercing a non-Federal sponsor to contribute to the Project.

In August 2013, the Corps provided Plaintiffs with its 2013 sediment evaluation.   In asking Plaintiffs for comments, the Corps feigned an open-mind, but demonstrated no real

intention of engaging in a collaborative discussion.  For example, on March 1, 2014, Kozlowski instructed Pickard:

> ... we need to clearly lay out why OEPA should not follow the Great Lakes Testing Manual.… This other part is to again, present why the Antidegradation doesn't apply to our final decision.…  We have to lock down hard on both these **to *continue* having our firm position to move toward Open lake placement.**

AR-SUPP0642000 (emphasis added); *also see* AR-SUPP0321106; AR-SUPP0320658; AR-SUPP0319786; AR-SUPP0681361; AR-SUPP0642005; AR-SUPP0681317; AR-SUPP0321311; AR-SUPP0084547 (Asquith to Pickard upon receiving a summary of the draft 2013 evaluation: "Blah..Blah.. Blah..Blah……the upper river material can be placed in the open lake area…..Blah..Blah.. Blah..Blah.. Done. Chisel it in stone.") (ellipses in original); AR-SUPP0637897 (Pickard: "everyone's time has been wasted catering to the whims and arrogance of OEPA." — Asquith: "although OEPA appears to be getting their way with a couple procedural items, your efforts have stirred up an issue that is drowning them technically and the whole organization is over their head. (sic)  Try to enjoy that."); AR-SUPP0613030 (Keil in 2014, warning against use of a particular model because "it is possible that expanding the evaluation of PCB bioaccumulation … could lead to the opposite conclusion.").

The most revealing email, however, was sent by Buffalo District's Chief of Operations, Josh Feldman, to Buffalo District Management on March 13, 2014 (while technical discussions were still occurring). AR-SUPP1067933; AR-SUPP1067935.  At that time, the Buffalo District had just sent a recommendation to Assistant Secretary Darcy that the Corps should defer dredging of the Cleveland Harbor in 2014, recognizing that doing so would cause "immediate and severe impacts to the ArcelorMittal Steel plant and commercial navigation in the upper river channel." AR-SUPP0190154; AR-SUPP0190156.   Despite the serious nature of the recommendation, Feldman took a picture sticking up his middle finger, added it to the memo,

and then recirculated the memo for the Buffalo District management.  AR-SUPP1067933; AR-SUPP1067935.  Whether Feldman was directing his middle finger at Ohio, the Port, ArcelorMittal, or some other entity need not be discerned.  For the Corps' Buffalo District Chief of Operations to joke around about a decision that would put thousands of jobs at risk did not reflect "fairness and solicitude toward the concerns of channel users" (Doc. 104-1, pageID 9498) and demonstrates that the Corps did not have "the desire to build goodwill" (Doc. 104-1, pageID 9492).  Further, it demonstrates that personal animus was clouding professional judgment.

Within the same month that Feldman circulated his email, Asquith pitched a position—with apparent agreement from the Buffalo District's Chief of Construction, Matthew Snyder, and Senior Project Manager, Frank O'Connor—proposing a plan that involved deception and that suggested using the steel plant as a poker chip. AR-SUPP0644645.  The Corps argues that the egregiousness of this proposal is nullified by a claim that the Corps never followed through with the secret plan. Doc. 104-1, pageID 9497.  However, again the Corps misses the point.  Regardless of whether the Corps followed through with the proposal, Asquith, the Project Manager, was advocating the leveraging of navigational problems and their dire consequences, a position directly contrary to the Corps' statutory duties, to advance the Corps' objectives. Additionally, if this email were as innocent as the Corps argues, there would have been no need for its final line: "We would keep this plan to ourselves if possible to keep the heat on others for full open lake placement." AR-SUPP0644645.

The arrogant and biased attitude revealed in these types of emails demonstrates that the entire process was tainted and biased and, therefore, also arbitrary and capricious. *W. Watersheds Project v. U.S. Forest Serv.*, 535 F. Supp.2d 1173, 1187-90 (D. Ida. 2007).  The Corps cannot now legitimately claim to have considered public, State, and local concerns, when the Record

34

establishes that it predetermined a course of action and proposed, if not followed, multiple courses of action to denigrate Plaintiffs and their arguments and to secretly force Plaintiffs to concede.  Viewed in *this* (correct) context, coupled with the Corps' deviations from established procedures and scientific manuals and its failure to allow or consider public comment, exposes the Corps' inappropriate and unlawful result-oriented decision-making in all of its actions regarding the 2015 Cleveland Harbor Project.  Therefore, the Court should grant Summary Judgment in Plaintiffs' favor.

## <u>Conclusion</u>

Congress intended for the Corps to maintain commercial Great Lakes Harbors.  Congress intended for the Corps to pay for that maintenance, regardless of the additional costs necessary to comply with State water quality standards. Congress intended for States to set and enforce those water quality standards. Congress intended for open-Lake disposal to be reduced to the maximum extent practicable.  The Corps' legal position dismisses all of these clear statements from Congress as irrelevant and further exposes the Corps' belief that its actions should be allowed to contradict Federal law, regulations, and policy.  For these reasons and those in Plaintiffs' Motion for Summary Judgment, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment.

Respectfully submitted,

**MICHAEL DeWINE**
**OHIO ATTORNEY GENERAL**

/s/ *David Emerman*

**DALE T. VITALE (0021754)**
**DAVID E. EMERMAN (0089348)**
**JANEAN WEBER (0083960)**
**AMY C. FACTOR (0093611)**
Assistant Attorneys General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215-3400
Telephone:  (614) 466-2766
Facsimile:  (614) 644-1926
Dale.Vitale@OhioAttorneyGeneral.gov
David.Emerman@OhioAttorneyGeneral.gov
Janean.Weber@OhioAttorneyGeneral.gov
Amy.Factor@OhioAttorneyGeneral.gov

**RICHARD COGLIANESE (0066830)**
Principal Assistant Attorney General
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
Telephone: (614) 644-7257
Facsimile: (614) 752-4677
elsreview@OhioAttorneyGeneral.gov

*Counsel for Plaintiff, State of Ohio*

s/ *Louis L. McMahon* (per authorization)

LOUIS L. McMAHON (0067378)
KEELY J. O'BRYAN (0071438)
McMAHON DeGULIS LLP
The Caxton Building
812 Huron Road E, Suite 650
Cleveland, Ohio 44115
Telephone: (216) 621-1312
Facsimile: (216) 621-0577
lmcmahon@mdllp.net
kobryan@mdllp.net

*Counsel for Intervening-Plaintiff,*
*Cleveland-Cuyahoga County Port Authority*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the January 23, 2016, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. mail.  Parties may access this filing through the Court's system.

/s/ David E. Emerman
Assistant Attorney General