IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 1:15-CV-679 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS | ) | MEMORANDUM OPINION |
| OF ENGINEERS, *et al.*, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |

This case is before the Court on the parties' Cross Motions for Summary Judgment. (ECF #101, 104). Plaintiff, State of Ohio and Intervening Plaintiff, Cleveland-Cuyahoga County Port Authority (collectively "Plaintiff"), filed a Motion for Summary Judgment asking this Court to order the United States Army Corps of Engineers complete the entire 2015 Cleveland Harbor Dredging Project, including the Upper Channel, and to bear the full cost for disposing of all sediment from the Project in a confined disposal facility, in compliance with the Ohio Environmental Protection Agency's ("OEPA") water quality certification conditions. (ECF #101). *Amicus Curiae* briefs supporting this request were filed by ArcelorMittal Cleveland LLC, and Cuyahoga County. (ECF #112, 118).

Defendants, United States Army Corps of Engineers, John M. McHugh, Jo-Ellen Darcy,

Thomas P. Bostick, Richard G. Kaiser, and Karl D. Jansen ("Defendant")[1] filed a Cross Motion

for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment. (ECF

#104). Plaintiff filed a combined Reply brief and Opposition to the Defendant's Cross Motion

(ECF #110), and Defendant filed its own Reply. (ECF #115). The issue is now ripe for

determination.

## BACKGROUND[2]

The United States Army Corps of Engineers ("the Corps") is an agency of the federal

government that is supposed to "provide[] safe, reliable, efficient, and environmentally

sustainable waterborne transportation systems (channels, harbors, and waterways) for movement

of commerce, national security needs, and recreation."[3] Specific to this action, the Corps is

required to expedite the operations and maintenance, including dredging, of the navigation

features of the Great Lakes in order to support commercial navigation. 33 U.S.C. §426o-2. One

way the Corps maintains navigational channels is by removing sediment and other material that

has accumulated at the bottom of the bodies of water. This process is called "dredging."

Dredging is used to maintain the depth of rivers and channels to enhance their navigability.

Dredging is necessary to maintain the depth of the waterways and allow sufficient

---

[1]

  Because the individual Defendants have all been named in connection with their official
  duties at the United States Army Corps of Engineers, the Court will refer to the
  Defendants as "the Corps" and use the singular "Defendant" to refer to all collectively
  throughout this opinion.

[2]

   The Background section is culled from undisputed facts set forth in the parties briefing
  of this motion, and the original motion for Temporary Restraining Order.

[3] http://www.usace.army.mil/Missions/Civil-Works/Navigation/

clearance for large cargo ships to navigate along the Cuyahoga River in an area known as the Cleveland Harbor Federal Navigational Channel ("Cleveland Harbor"). The Cleveland Harbor consists of three sections of water: 5.5 miles of shoreline enclosed by breakwater structures; 5.8 miles of the lower Cuyahoga River; and, 1 mile of the Old River. (ECF #13-2, p. 2). The Old River is also known as the Cuyahoga Navigational Channel ("the Upper Channel"), and is sometimes referred to by the parties as the "sixth mile."

Several industrial facilities are served by the commercial ships traversing the Cleveland Harbor. One such facility is ArcelorMittal Cleveland, which is one of the largest and most productive steel mills in the world. (ECF 13-31, ¶5).[4] This plant employs 1,900 people and has an annual raw steel production capacity of 3.8 million tons. (Id. at ¶¶4 and 5). Sixty percent of the steel produced from ArcelorMittal Cleveland is used in the State of Ohio for construction and by Ohio manufacturers. (Id. at ¶5). If appropriate dredging of the waterways does not occur, and commercial vessels are not able to safely traverse the waters, ArcelorMittal Cleveland and other commercial entities would face significant threats to the continuation of their business and all of the entities relying on the steel produced in that plant could suffer a significant loss of resources.

The importance of dredging this section of the Cleveland Harbor, and the severe economic consequences that would result if dredging were not routinely accomplished have been recognized by the Corps in multiple written documents. (AR0004592; AR0005054; AR-SUPP0101835 (April 2014 Letter from Corps District Commander Owen J. Beaudoin); AR-SUPP0128557-58

---

[4] Plaintiff refers to this Exhibit as the "Declaration of Clarence Hauge," but this Court takes notice that it is actually the "Declaration of Eric Hauge."

(March 2014 Corps Issue paper).[5]  In fact, the Corps stated in its 2015 application for a permit

under Section 401 of the Clean Water Act ("CWA") that if dredging did not occur:

> [t]he large industrial base that depends on the harbor to transport commodities
> would no longer be able to do so cost-effectively.  The harbor would no longer be a
> viable alternative for the transportation of goods.  This would negatively impact
> the annual $1.7 billion in direct revenue; over 15,000 direct, indirect, and induced
> jobs; and $1 billion in personal income generated by the continued viability of the
> Harbor.  Losses of between one and two feet of channel depths would result in
> increased transportation cost between $2.3 million and $5.2 million annually.

(AR-SUPP0110077: Corps' Application for 401 Permit).

Congress has provided the Corps with authorization and funding to dredge the Cleveland

Harbor annually since the CWA was enacted approximately forty years ago.  (AR0004089; ECF

#104-1 at PageID 9481; ECF #101-1 at PageID 9372).  Again in 2015, Congress authorized the

Corps to dredge the Cleveland Harbor and allocated funds for the dredging and disposal of

sediment and other dredging materials ("sediment").  The Congressional allocation for 2015

anticipated disposing of the sediment in a confined disposal facility ("CDF").[6]  (AR-

SUPP1086688).  The 2015 dredging project was originally scheduled to begin on or after May

15, 2015.

In preparation for the 2015 dredging project, the Corps applied for an Ohio water quality

---

[5]

  The AR and AR-SUPP citations refer to the Administrative Record, and the Supplement
to that Record.  The Relevant portions of these documents can be found in the Exhibits to
the parties briefs.

[6]

The fiscal year 2015 bud get was programmed in fiscal year 2013 when the Corps did not
believe that open-lake placement was even an option.  That budget included O&M funds
for "mechanical placement," and included some Construction General Funding to allow
"some improvements to the current CDF to allow for placement of material if needed."
(AR-SUPP1086688).

certification ("WQC") pursuant to Section 401of the CWA, 33 U.S.C. §§1341.  This certification

is required for projects that could impact State water quality, including through the disposal of

dredged sediment.  (ECF #13, p. 17).  During the application process, the Corps performed an

analysis of the sediment in various sections of the Cleveland Harbor using various testing

methods.  (AR0003618-19; AR0003629; AR0000065, 75, 137; AR0000608-09).  The Corps does

not dispute that carcinogenic toxins - specifically polychlorinated biphenyls ("PCBs") –  are

present in the sediment from the Upper Channel.  In fact, during its evaluation process, it found

that the PCB levels in the sediment were of concern and merited "investigation through

bioaccumulation testing."  (AR0003629).  The bioaccumulation testing performed by the Corps

concluded that two thirds of the sediment from the Upper Channel showed no statistical increase

in PCB bioaccumulation when compared to exposure from the proposed disposal site,[7]

(AR0005089; AR0003637, 3706-07; AR0003809), and that one third did show a statistical

increase in bioaccumulation compared to this site.  (AR0005089).

---

[7]

Defendant determined the expected impact by applying the Inland Testing Manual's
("ITM") anti-degradation standard.  Generally, this standard compares the quality
(pollutant levels) of the discharge to the levels currently existing in the proposed disposal
area.  In this case, the Corps considered two placement areas, CLA-1 and CLA-4.
(AR0003616).  It ultimately chose CLA-1, a site that already had elevated PCBs
bioaccumulation due to prior contamination, (AR0003735-36), because compared to
CLA-4, all of the tested sediment had statistically higher PCB bioaccumulation results.
(AR0003700; AR0003707; AR-SUPP0256464; AR0005089).   Plaintiff argues that
meeting the ITM's anti-degradation standards is not enough to permit discharge of PCP
laden sediment into the Great Lakes.  The Great Lakes Testing Manual, which is specific
to these bodies of water, and which the Corps is supposed to consider, sets forth more
stringent testing guidelines than does the ITM.  (AR0003737-38, 3743-44). The Great
Lakes Initiatives, the Ohio Anti-degradation standard, and other water quality control
plans and guidelines relating specifically to the Great Lakes are more stringent because
they seek not just to prevent increased pollution of the waters, but to remediate, restore,
and improve the quality of these waters.

Using the results of the sediment analysis and considering the cost of various sediment disposal methods, the Corps calculated what it calls the "Federal Standard" for sediment disposal from the Cleveland Harbor. The Federal Standard is supposed to identify "the dredged material disposal alternatives ... which represents the least costly alternatives consistent with sound engineering practices, which meet the environmental standards established by the Section 404(b)(1) evaluation process or ocean dumping criteria." 33 C.F.R. §335.7.

The Corps concluded that sediment dredged from most of the Cleveland Harbor should be disposed of in a CDF. However, the Corps decided that open-lake placement of the sediment from the entire Upper Channel would be appropriate and would not impact the environment "in light of existing PCB contamination and bioaccumulation levels at the proposed disposal site." (ECF #104-1, at PageID 9478; AR0003639; *see also,* AR0005050-41, 5080, 5088, 5295). Defendant estimated that open-lake placement of this portion of the Cleveland Harbor sediment was the least costly alternative, and would save the Corps approximately $1,283,300 over the cost of CDF disposal. (ECF #25).

On March 27, 2015, the Director of the OEPA wrote to the Assistant Secretary of the Army for Civil Works requesting that she "exercise [her] discretion . . . pursuant to [her] authority under 33 C.F.R. §337.2(b)(3) and 33 C.F.R. §337.8 [to] agree [] to place the material in . . . [CDFs] at full federal expense." (AR-SUPP0437660). The Assistant Secretary replied that she was "not authorized under 33 C.F.R. §337.2 to use Federal funds to place material in a manner that is inconsistent with the Federal Standard determination." (AR-SUPP000001).

On March 31, 2015, the State approved the water quality certification request for dredging the entire Cleveland Harbor, but included a condition requiring that all dredged materials from the

entire length of the Cleveland Harbor, including the sediment from the Upper Channel, be

disposed of in a CDF. The OEPA and the Ohio Department of Natural Resources (collectively

"the State") declined to certify any discharge into the open waters of Lake Erie based on its

determination that the Upper Channel sediment contains PCBs. (AR0005819-5823). Rather

than appeal or otherwise administratively challenge the disposal requirements contained in the

State's WQC,[8] the Corps declared that it would not bear the cost of CDF disposal for the Upper

Channel sediment. It then gave the State an ultimatum: either find a way to pay for the CDF

disposal for the Upper Channel sediment using non-federal money, or the Corps will not dredge

that section of the Cleveland Harbor.

On April 9, 2015, the Assistant Secretary of the Army sent a letter to the Director of the

OEPA stating that based on a "comprehensive technical evaluation focused on the upper

Cuyahoga River navigation channel sediments, in accordance with the CWA Section 404(b)(1)

Guidelines and formal guidance jointly developed by the Corps and U.S. Environmental

---

[8]

The Corps contends that if it had appealed the state's denial of the Water Quality
Certificate ("WQC") it would have deprived itself of the benefit of the APA's arbitrary
and capricious standard. It says that the "State cannot substitute an internal and irrelevant
state administrative appeals process of the Ohio EPA's decision to avoid proving that the
Corps' independent determination of the Federal standard was arbitrary and capricious."
Ironically, it is the Corps who has attempted to substitute its own internal agency appeals
process for the State's process to avoid having to prove that the State's decision was
arbitrary and capricious. The Corps does not have the authority to pick and choose its
own standard of review. It is subject to and must "comply with, all Federal, State,
interstate, and local requirements, administrative authority, and process and sanctions
respecting the control and abatement of water pollution in the same manner and to the
same extent as any nongovernmental entity." 33 U.S.C. §1323. The State's decision is
final unless appealed through the administrative appeals process. That means that the
Corps should have to exhaust administrative remedies, and be subject to the state's
decisions unless the State's determination, not its own interpretation, is found to be
arbitrary and capricious, as would any other nongovernmental actor who challenges the
state's decisions on water certification issues.

Protection Agency" and using the "dredged material placement method that represents the least costly alternative consistent with sound engineering practices and meets the environmental standards established by the CWA Section 404(b)(1) evaluation process," the Corps determined that open-lake placement was appropriate for the "dredged material from the uppermost mile of the Federal navigation channel (80% of the total volume)." (AR-SUPP0000002). The letter went on to say that a "non-Federal partner would be required to pay the costs in excess of the Federal standard and any contractor claims, and would also pay for or provide CDF [confined disposal facility] capacity in the future (without a tipping fee equivalent to that used in the Federal CDF. . . In the absence of a non-Federal cost sharing partner, and assuming a CWA section 401 Water Quality Certification that does not authorize open lake placement, the Corps will dredge the . . . lower channel...[but] would be unable to dredge the upper channel in a manner consistent with the Federal standard." The Corps gave the State until May 25, 2015 to provide an executed agreement and deliver funds from a non-Federal partner or forfeit dredging of the Upper Channel. (AR-SUPP0000002).

After unsuccessfully attempting to persuade the Corps to back off from this ultimatum, the State filed this action, along with a request for a Temporary Restraining Order and Preliminary Injunction, asking the Court to compel the Corps to dredge the Upper Channel as originally planned, and to require them to pay for the disposal of the dredged sediment in compliance with the State's WQC requirements. (ECF #13). This Court granted the Plaintiff's Motion for Preliminary Injunction, ordered the Corps to dredge the Upper Channel and to deposit the dredged material in a CDF, and set a briefing schedule to determine who should bear the cost of the CDF

disposal.[9]  (ECF #33).  Subsequently, Plaintiff sought leave to expand the administrative record, which this Court granted.  The issue is now fully briefed and ready for resolution.

## STANDARD OF REVIEW

The  Administrative Procedures Act ("APA"),  5 U.S.C. §701, *et seq*. allows persons "suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to obtain judicial review of that action.  5 U.S.C. §702.  The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. §551(13); *see also, Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004).  The United States Supreme Court has interpreted "agency action" as "cover[ing] comprehensively every manner in which an agency may exercise its power."  *Whitman v. Am.  Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001).

Agency action is reviewable if made so by statute, or it is a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. §703.  In general, a final agency action under the APA must "mark the consummation of the agency's decisionmaking process," and "must be one by which rights or obligations have been determined, or from which legal

---

[9]

   During the pendency of this litigation, an identical issue arose with regard to the 2016 Cleveland Harbor Dredging Project.  The Corps again refused to dredge the Upper Channel unless Plaintiff provided non-federal funds to pay for CDF disposal of the sediment.  Plaintiff again filed suit to compel the Corps to dredge.  Eventually, the Parties agreed to go forward with the 2016 dredging and to deposit materials in a CDF without awaiting a decision on which party should bear the ultimate cost of the CDF disposal. (ECF #22 in Case No. 1:16-cv-02328, filed September 19, 2016).  The Corps began dredging in the fall of 2016 but was unable to complete the required amount of dredging before the winter weather interfered with operations.

consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. ___, 136 S.

Ct. 1807, (2016)(decided May 31, 2016)(*quoting Bennett v. Spear*, 520 U.S. 154 (1997)).

Judicial review of agency actions is limited only to the extent that "(1) statutes preclude

judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C.

§701(a)(1) and (2); *Diebold v. United States*, 947 F.2d 787 (6th Cir. 1991).  The "committed to

agency action" exception has been held to be "a narrow one."  *Heckler v. Chaney*, 470 U.S. 821,

838 (1985).  Agency action has been held to be committed to agency discretion generally only

where there is "no law to apply."  *Duncan v. Myzyn*, 833 F.3d 567, 577 (6th Cir. 2016), quoting

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also, Heckler*, 470

U.S. at  830 (actions committed to agency discretion when the statute is "drawn in such broad

terms that in a given case there is no law to apply").  Judicial review requires "standards,

definitions, or other grants of power [that] deny or require action in given situations or confine an

agency within limits as required by the Constitution."  S. Doc. No. 248, 79th Cong., 2d Sess. 212,

at 275 (1946).  An agency's decision cannot prevail, however,  if it violates the Constitution or a

federal statute.  *Stinson v. U.S.*, 508 U.S. 36, 45 (1993).  Agencies are also required by law to

follow their own regulations.  *Meister v. U.S. Dept. of Agriculture*, 623 F.3d 363, 371 (6th Cir.

2010); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

The APA requires reviewing courts to

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to
be

   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
   accordance with the law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. §706.  In order to compel agency action under 5 U.S.C. §706(1), a court must find that there is some discrete action that the agency was required to take, which it withheld or unreasonably delayed.  *See, Norton*., 542 U.S. at 63-64.

Although a request for review of a federal agency action is generally brought to the court on cross-motions for summary judgment, courts conducting judicial review under the APA do not follow the standard set forth in Fed. R. Civ. P. 56.  Instead, their standard of review is set by the terms of the APA.   When conducting judicial review under the APA courts do not ask whether the facts are undisputed, but rather, "whether as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Ohio Valley Env'tl. Coal. v. Hurst*, 604 F.Supp. 2d 860, 879 (S.D. W.Va. 2009), citing *Sierra Club v. Mainella*, 459 F.Supp. 2d 76, 90 (D. D.C. 2006).

## ANALYSIS

Plaintiff asks the Court to review several agency conclusions, and to overturn the Corps' decision concluding that dredged material from the Upper Channel is suitable for open-lake placement. Plaintiff also seeks to invalidate the Corps' decision to defer dredging of the Upper Channel absent authorization for open-lake placement of the dredged sediment or receipt of funding contributions from a non-federal source. Plaintiff seeks various forms of relief, including an Order that requires the Corps to dredge the Upper Channel and pay for disposal of the sediment in a CDF. Plaintiff claims that Defendant is bound by law to follow the WQC requirements of the State and to pay for associated costs, and argues that even if the Corps has the authority to override the States' WQC determination, the conclusion that open-lake placement was environmentally acceptable was substantively and procedurally flawed, and violated the Corps' own regulations.

Defendant, does not challenge the State's authority to prohibit it from depositing dredged material into Lake Erie. It says that it has no intention of violating the State's WQC conditions or the Coastal Zone Management Act by placing the dredged sediment in Lake Erie, (ECF #104-1, at PageID 9478). Defendant does, however, argue that it is bound by the Federal Standard and by 33 C.F.R. §337.2(b)(3) to defer dredging the Upper Channel unless and until a non-federal partner pays the cost difference between the Federal Standard's designated alternative (open-lake placement) and the State's required alternative (CDF disposal). Ultimately, the Defendant contends that unless there is a statutory mandate specifically requiring it to dredge the Upper Channel at this time, and to pay the cost of CDF disposal, the Court has no authority to review its decision to forego dredging for any reason.

By focusing almost solely on the discretion it has to prioritize projects within the scope if

its authorizing statute, 33 U.S.C. §426o-2, the Corps has attempted to limit the scope of the Court's review. The Corps' discretion to prioritize projects under 33 U.S.C. §426o-2 is not being challenged, however, so the Court's deference to this discretion does not limit the scope of its review in this case. There is no dispute that the Corps exercised this discretion by prioritizing the dredging of the Cleveland Harbor over other potential operational and maintenance projects within its purview, and the Corps has never argued that the Cleveland Harbor would not have been prioritized or funded for dredging if the cost of CDF disposal for the Upper Channel's dredged materials had been known or considered.[10]

The real dispute is whether the Corps, once it had exercised this discretion, had the legal authority to refrain from dredging the Upper Channel simply because it disagreed with the State's application of Ohio's water quality standards. This question requires a review of several of the Corps' determinations, including whether the Federal Standard could override the State's determination of what alternatives would satisfy the requirements of the CWA; whether it properly determined the Federal Standard; whether it had a legal obligation to pay the costs of compliance with the State's WQC conditions; and, whether it was required to proceed with dredging once Congress authorized and provided funding for the Project.[11]

---

[10]
At the time the decision was made to prioritize the dredging of this Upper Channel over other commercial navigational waters under the Corps' authority, Congress, the Corps, and all other involved parties presumed that CDF disposal would be required.

[11]
 Each determination was a "final agency action" subject to review because the Corps treated each of them as the end of the decisionmaking process on that point, and legal consequences flowed from each decision. *See, U.S. Army Corps of Engineers v. Hawkes Co., Inc*., 578 U.S. ___ (2016)(decided May 31, 2016)(*quoting Bennett v. Spear*, 520 U.S. 154 (1997)). If any one of these questions had been answered differently, dredging would have gone forward and the Corps would have paid for the

## A. <u>Reviewability</u>

There were several reviewable Corps' decisions which led it to the ultimate decision to refrain from dredging the Upper Channel. If the Corps lacked statutory authority to make these determinations, or if these decisions were arbitrary, capricious, or otherwise not in accordance with the law, neither they, nor the final decision they precipitated can be allowed to stand. 5 U.S.C. §706(2)(A) and (C). Further, if these decisions caused the Corps to unlawfully withhold or unreasonably delay an action it was required to take, this Court is required under the APA to compel the Corps to act. 5 U.S.C. §706(1). An agency's decision cannot prevail if it violates a federal statute, and no agency can override statutory requirements by enacting a contradictory agency rule. *See, e.g.*, *Stinson v. U.S.*, 508 U.S. 36, 45 (1993).

The parties agree that the dredging operations for the operation and maintenance of navigational features of the Great Lakes and Connecting Channels are duties that are delegated to the Army Corps of Engineers by Congress through the Water Resources Development Act of 2007 ("WRDA"). Specifically, 33 U.S.C. §426o-2 requires that the Corps, "[u]sing available funds . . . shall expedite the operation and maintenance including dredging of the navigation features of the Great Lakes and Connecting Channels for purposes of supporting commercial navigation to authorized project depths."[12]

CDF disposal.

[12]

  33 U.S.C. §426o-1 states that "[i]n operating and maintaining Federal channels and harbors of, and the connecting channels between, the Great Lakes, the Secretary shall conduct such dredging as is necessary to ensure minimal operation depths consistent with the original authorized depths of the channels and harbors when water levels in the Great Lakes are, or are forecast to be, below the International Great Lakes Datum of 1985."

Defendant argues that because this provision does not create a specific obligation to dredge any particular area, in any particular year, it has full discretion to prioritize and optimize the limited federal funding available for the many federal navigational features of the Great Lakes region. (ECF #115 at 14). [13] It claims, therefore, that the decision of whether to dredge the Upper Channel is committed to agency discretion and is unreviewable.[14] Although the Corps has some degree of discretion to determine what projects should be prioritized within the amount of resources available, its discretion in this matter is not unlimited. Thus, it does not qualify as "agency action committed to agency discretion by law." 5 U.S.C. §701(a)(2).

Agency action has been held to be committed to agency discretion generally only where

---

Although this provision was cited by Plaintiff in its original application for a Preliminary Injunction, no party relies on it in their current briefing. Under the mandatory language of this provision, the Corps would be obligated to dredge the Upper Channel if the depths of a Federal channel are forecasted to drop below the statutory threshhold amount, however, neither party has claimed that the Upper Channel is a "Federal channel" under the statute, or that the water levels in the Upper Channel were forecasted to drop below the statutory mandatory minimum threshold in 2015.

[13]

The Corps argues that it must balance the operational and maintenance needs of all 140 harbors and channels within the Great Lakes when prioritizing the use of its resources. Only sixty of the harbors under the Corps' authority are commercial, however, and 33 U.S.C. §426o-2 was enacted for the purpose of supporting commercial, not recreational, navigation.

[14]

The Corps also claims that because 33 U.S.C. §426o-2 does not require any discrete action, it cannot be compelled to dredge, or to pay for CDF disposal under 5 U.S.C. §706(1). A court cannot compel agency action without finding that there was "discrete action" the agency was required to take. *Norton*, 542 U.S. 55. Plaintiff alleges that the Corps is required to take certain discrete actions in the performance of its duties under 33 U.S.C. §426o-2, including completing the approved dredging project, satisfying the State WQC conditions, and paying for the cost of compliance with those conditions. If the Court finds these actions were required under the applicable law, it is obligated under 5 U.S.C. §706(1) to compel the Corps to take those actions without delay.

-15-

there is "no law to apply." *Duncan v. Myzyn*, 833 F.3d 567, 577 (6th Cir. 2016), quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also, Heckler v. Chaney*, 470 U.S. 821, 830 (1985)(actions committed to agency discretion when the statute is "drawn in such broad terms that in a given case there is no law to apply."). In this case, there is no shortage of law to apply. There are limitations within the authorizing statute that guide the Corps in how to prioritize its operational and maintenance duties,[15] and in how much it should spend to execute those duties.[16] The Corps determined that the dredging project at the Cleveland Harbor was a priority and should be funded pursuant to its obligations under 33 U.S.C. §426o-2.[17] There is no question that prioritizing the Cleveland Harbor dredging project was within the Corps' discretion, and that it fit within the statute's authority to expedite operations and maintenance of navigational features of the Great Lakes in order to support commercial navigation. The Corps has significantly less discretion, however, in how it can execute a project once it has been prioritized and has received Congressional approval and funding. There are statutory and regulatory mandates addressing how each project should be handled from an environmental standpoint, and addressing the agency's obligation to pay the costs of compliance.

---

[15] The Corps must *expedite operation and maintenance*, including dredging, of the *Great Lakes and its Channels*, in order to *support navigation* for *commercial purposes*. 33 U.S.C. §426o-2 (emphasis added.)

[16] The Corps must use "available funds" to accomplish its duties under the statute. 33 U.S.C. §426o-2.

[17] The Corps' budget for the 2015 Cleveland Harbor dredging project, was established in 2013. The budget included Operation and Maintenance funds to be used for "mechanical placement," and included some Construction General Funding to allow "some improvements to the current CDF to allow for placement of material if needed." (AR-SUPP1086688).

Disposing of sediment is an unavoidable consequence of performing operation and maintenance obligations under the statute, and it is a highly regulated activity subject to a number of statutes, state laws, and other agency regulations. Much of this body of law comes in the form in Congressional directives set forth in federal statutes. In addition to fulfilling the obligations of the authorizing statute, 33 U.S.C. §426o-2, the Corps is required by statute to comply with all federal, state, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution, 33 U.S.C. §1323(a), and to comply with both substantive and procedural state or interstate requirements aimed at controlling the discharge of dredged or fill material into navigable waters. 33 U.S.C. §1344(t). In addition, agencies are subject to the requirements of the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §1453, and are required to obtain a certification from the state in which any discharge will originate. 33 U.S.C. §1341(a)(1). There are also federal statutes that outline what operation and maintenance costs, and compliance costs the Corps is responsible for funding. 33 U.S.C. §2211. Not only is the Corps' discretion limited by these federal statutes, but it is also bound to comply with state environmental laws and certification decisions that are given federal force through the CWA and other federal environmental statutes.[18]

In addition, there are applicable agency regulations dictating the means and methods by which the agency is to make decisions, regulations defining the deference to be afforded state environmental determinations, regulations setting forth how compliance costs above and beyond the amount authorized by the Federal Standard are to be allocated, and regulations providing

---

[18] These include, but are not limited to Ohio's water quality certification determinations, and Ohio's anti-degradation statute, which is codified at O.A.C. §3745-1-05.

-17-

standards for evaluating the environmental impact of contaminated discharge. Some of these agency standards reinforce the requirements set forth in federal statutes and regulations. Others may conflict with applicable federal statutes, state environmental laws, and international agreements, and are subject to review on this basis. The Corps has been given little to no discretion when it comes to complying with state environmental laws and standards, and has been given no discretion to delegate the costs associated with such compliance. Therefore, determinations related to compliance with state water quality standards, the payment of costs associated with such compliance, and the appropriateness of discharging dredged material into the Great Lakes are all subject to judicial review within the constraints of the APA.

## B. Statutory Obligations and Other Limitations on the Agency's Authority

On its face, the Corps' Federal Standard appears to be a rational and prudent regulation meant to curb excess spending of tax-payer money[19] by ensuring that the least costly alternative, within the constraints of the CWA's requirements, be utilized for the disposal of dredged material. The Corps, however, has interpreted this regulation in a way that conflicts with federal, state, interstate requirements which relate to the control and abatement of water pollution. The Corps misinterprets its authority to determine what alternatives comply with the CWA. See, e.g., 33

---

[19]

 The operations and maintenance funds that pay for the dredging are not actually derived from taxes imposed on general citizens, but from the Federal Harbor Maintenance Trust Fund, which is funded by the Harbor Maintenance Tax ("HM Tax") collected from maritime shippers. "The tax is levied on importers and domestic shippers using coastal or Great Lakes ports" based on cargo value. (AR-SUPP0755689; see also, ECF #13-20, Page ID #913, 915, 950 (Fiscal Year 2015 Civil Works Budget of the U.S. Army Corps of Engineers)). Therefore, based on the high commercial usage of the Upper Channel, using the Federal Standard to justify withholding dredging assistance for the Cleveland Harbor may well end up costing the fund more than the cost of complying with the State's CDF requirements.

U.S.C. §1323(a); 33 U.S.C. §1341(a)(1); 33 U.S.C. §1251(b); 16 U.S.C. §1452; 40 C.F.R. §230.10; 33 C.F.R. §320.4(d); 33 C.F.R. §320.1(a)(5); 33 C.F.R. §336.1(b)(8).   In addition, its tenacious adherence to the Federal Standard ignores its statutory and regulatory obligations to use all available funds to expedite commercial navigation projects, to fully fund operational and maintenance projects aimed at supporting navigation, and to implement the most environmentally friendly disposal alternatives whenever practicable. *See, e.g.*, 33 U.S.C. §426o-2; 33 U.S.C. §2211; 33 U.S.C. §1344(t); 33 U.S.C. §1323(a); 16 U.S.C. §1456(c)(1)(A); 33 U.S.C. §1268; 33 C.F.R. §337.2(a); 40 C.F.R. §230.10(a); 33 U.S.C. §1251(a) .  Agency rules cannot be used to contravene statutory mandates or interfere with Congress' stated or intended purpose.[20]  *See, Chevron U.S.A. Inc. v. Natural Res. Def.Council, Inc.,* 467 U.S. 837, 842-43 (1984); *Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008).   In addition, an agency's interpretation of its own regulations, though afforded great deference, is not controlling if it is plainly erroneous or inconsistent with the plain language of the regulation. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989); *Kentucky Waterways Alliance*, 540 F.3d at 474.  Agency interpretation of its own regulation is plainly erroneous if it contradicts a Congressional directive, or exceeds the scope of the agency's delegated power.

1. <u>**The State's Authority to Determine Compliance With the Clean Water Act**</u>

Essential to the Corps' position throughout this litigation is its belief that the agency has

---

[20]

The Congressional intent may be gleaned from the plain language of federal statutes, as well as by records of Congressional intent made in connection with the passage of such statutes.  The intent of the statute is to be considered along with the language of the statute.  "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers."  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975), citing *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892)

the final authority to determine whether its proposed sediment disposal alternative satisfies the requirements in Section 404(b)(1) of the CWA. The Corps has asserted that it has "independent authority" under its self-created regulations to determine whether a proposed discharge would comply with state water quality certification requirements, thereby satisfying the U.S. EPA's 404(b)(1) regulations.[21] (ECF #104-1 at PageID 9523-24). The governing law gives the Corps no such authority

Section 404(b)(1) requires compliance with state water quality standards and the CWA requires any applicant for a federal license or permit to conduct an activity which may result in any discharge into navigable waters, to provide to the licensing agency a certification from the state in which the discharge will originate. 33 U.S.C. §1341(a)(1). A state's certification process, once approved, is adopted by Congress through 33 U.S.C. §1313. This Court has previously recognized that "[t]he legislative purpose of the certification mechanism . . . is to assure that Federal licensing or permitting agencies cannot override State water quality requirements."[22] *City of Olmsted Falls v. U.S.E.P.A.*, 266 F.Supp. 2d 718, 726 (N.D. Ohio 2003).

---

[21]

Despite its declaration, the Corps has actually recognized the State's authority to determine compliance with the water quality standards by not pursuing its plan for open-lake discharge. The Corps could have challenged the State's decision a variety of ways but has not pursued this option through any formal legal proceeding. Instead, the Corps simply refused to dredge an economically vital section of the Cleveland Harbor unless the State found a payment source to cover the cost of CDF disposal. This is a derogation of its duty to maintain navigation, and to use available funds to expedite operations and management of Great Lakes harbors. It also leads to the conclusion that the motivation behind the Corps' ultimatum is not a belief that its proposed alternative is actually in compliance with the applicable environmental laws, but that the Corps should not have to pay the cost of compliance.

[22]

  33 U.S.C.§1341(b) does not limit the authority of any department or agency to require
  compliance with any other applicable water quality requirements. This reserve of power

Through this certification process, state water quality requirements take on the force of federal law, and become conditions which must be followed by federal permitting agencies.

In discussions surrounding the 1977 amendment to the CWA, Congress verified its intent to make the state requirements, as determined by the state, the ultimate authority on water quality standards. The Senate Committee on Environment and Public Works specifically addressed the Corps' obligation to comply with state imposed water quality certification standards as follows:

> Section 404 – mandates that all dredging activities of the U.S. Army Corps of Engineers be conducted in compliance with applicable state water quality standards, and all other State substantive and procedural requirements[23]. . . .
>
> By this Amendment, the committee clarifies that corps dredging activities are not exempt from State pollution abatement requirements. . . . Several corps district offices to date have requested and received funds to provide on land or confined disposal of dredge spoil. Pursuant to this amendment, the corps may be required by the State in some instances to expend additional funds to protect water quality.

S. Rep. No. 95-370 (1977), 1977 U.S.C.C.A.N. 4326.

Congress has stated that its policy is to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" and "to provide Federal technical services and financial aid to State and interstate agencies . . . in connection with the prevention, reduction, and elimination of pollution." 33 U.S.C. §1251(b). This is a clear indication that Congress did not intend for federal agency decisions to pre-empt state law in this area. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947). Rather, Congress intended states to

---

to the agency allows it to impose higher standards than the state, not to avoid compliance with the state's requirements.

[23] Because the Corps is obligated to follow state procedural, as well as substantive, requirements, it was required to appeal any unfavorable WQC decision in order to exhaust its administrative remedies.

have the primary responsibility, and the final say on issues of environmental protection. The U.S. EPA has also acknowledged through its regulations that the guidelines established by a federal agency do not supplant the requirements of other state or federal agencies. See, 40 C.F.R. §230.10.

The Corps' stated position that it has "independent authority" to determine whether a proposed discharge would comply with the State's water quality certification requirements, (ECF #104-1 at PageID 9523-24), also contradicts the Corps' own regulations, which acknowledge that a state's certification decisions "will be considered conclusive with respect to water quality considerations." 33. C.F.R. §320.4(d). Nonetheless, the Corps clings to the argument that it has unilateral authority, through the Federal Standard determination, to declare that its choice of disposal method meets 404(b)(1) standards.[24]

Through the CWA, Congress gave states the right to determine their own water quality certification standards and told agencies that they must abide by these standards to the extent practicable. Congress did not authorize agencies to override a state's interpretation of its own standards, or to seek contribution from other entities for the compliance costs. Nor did it tell

---

[24]

The Corps' claim of overriding authority also conflicts with its own statement of purpose and scope. The Corps' purpose statement defines its role as "protection of navigation" achieved "by balancing the favorable impacts against detrimental impacts." 33. C.F.R. §320.1(a)(1). In performing this role, the Corps is supposed to seek avoidance of unnecessary regulatory controls by eliminating federal control over activities "which are adequately regulated by another agency," 33 C.F.R. §320.1(a)(3), and by complementing rather than duplicating state regulatory programs. 33 C.F.R. §320.1(a)(5). Spending significant time and resources attempting to override, disprove, and challenge the state's determination as to whether the state WQC requirements are met for a specific discharge, and delaying dredging necessary to maintain navigation in an prioritized harbor when there were available funds to meet the state standards contradicts this purpose.

agencies that they did not have to comply with any state requirement that they deemed to be too expensive. Rather, Congress specifically and unambiguously told agencies that they must cooperate with the states, and comply with the state standards to the same extent as would any nongovernmental discharger.[25] When a Congressional mandate conflicts with agency rules and regulations, the Congressional mandate will prevail. *See, City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007). By declaring that open-lake placement was a viable alternative under Section 404(b)(1) of the CWA (and consequently under the Federal Standard), and ignoring the State's determination to the contrary, the Corps has exceeded it statutory authority, limitation, and rights. 5 U.S.C. §706. Because the state has the final authority to determine what alternatives will satisfy Section 404(b)(1) of the CWA, and CDF disposal was the only disposal alternative identified by the State, the Corps had no less costly alternative to consider under the Federal Standard.

### 2. The Corps' Obligation to Comply with State and International Water Quality Requirements

Congress has declared its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" and "to provide Federal technical services and financial aid to State and interstate agencies . . . in connection with the prevention, reduction, and elimination of pollution." 33 U.S.C. §1251(b). It has also explicitly stated that the purposes of the CWA are "to end the open water disposal of dredge spoil, " to eliminate the discharge of pollutants into the navigable waters, and to prohibit the discharge of toxic pollutants. 33 U.S.C. §1251(a)(1) and (3). All of the statutes, and any regulations

---

[25] In this case, Congress also gave the Corps sufficient funding to meet all State WQC requirements, making compliance "practicable" under both Congressional and agency definitions.

enacted in furtherance of the CWA must, therefore, be viewed with this purpose in mind.  *See, La. Pub. Serv. Com. v. FCC*, 476 U.S. 355, 372-73 (1986).

"[T]he CWA requires federal facilities and federal activities to comply with state water quality standards."  *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 132 F. Supp. 2d 876, 889 (D. Or. 2001).  Title 33 United States Code §1323(a) specifically requires all federal agencies, including the Corps, to submit to and comply with all federal, state, interstate, and local requirements dealing with the abatement of water pollution.  This section specifically states that

> each agency of the Federal Government, engaged in any activity resulting, or which may result in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner and to the same extent as any nongovernmental entity including the payment of reasonable service charges. . . . no exemption may be granted from the requirements of section 1316 or 1317 of this title.

 This is an unambiguous mandate applicable to the Corps and its actions in this case.  This statute strips the Corps of any discretion to refuse to abide by State requirements aimed at controlling and eliminating water pollution.[26]  Further, it requires federal agencies to comply with such standards "in the same manner and to the same extent as any nongovernmental entity

---

[26]

The only way for an agency to gain exception to this statutory requirement is for the President to exempt the agency from compliance if he determines it to be "in the paramount interest of the United States to do so."  33 U.S.C. §1323(a).  However, even the President's ability to provide an exemption is limited.  There can be no exemption from the requirements setting limits on toxic pollutant standards under 33 U.S.C. §1317, or the requirements for new sources under 33 U.S.C. §1316.  Further, the statute provides that such a Presidential exemption "shall not be granted" due to lack of appropriations unless he has "specifically requested such appropriation as part of the budgetary process and the Congress shall have failed to make available such requested appropriation."  33 U.S.C. §1323(a).   In this case, Congress actually appropriated money sufficient to allow the Corps to comply with the State's requirements.

including the payment of reasonable service charges."  Nongovernmental entities would never be allowed to shift the cost of compliance back to a state or to some other party.  They must pay for their own costs of compliance with a state's water quality standards.[27]  Therefore, pursuant to this statute, so must the Corps.  A contrary finding is not in accordance with the plain language of this law.

As discussed above, in addition to this broader directive, Congress has seen fit to require all entities who wish conduct an activity which may result in any discharge into navigable waters, including federal agencies, to obtain a certification from the State in which the discharge will originate.  *See*, 33 U.S.C. §1341(a)(1).  This requirement is mirrored, and expanded upon in the Corps' own regulations.  According to 33 C.F.R. §336.1(b)(8), the Corps is required to seek state water quality certification for dredged material disposal into waters of the United States.   The Corps has adopted regulations that provide guidance for what the agency should do when a the state certification process imposes a condition that contradicts the Federal Standard.  In such instances, the Corps' regulations dictate that its engineers "should cooperate to the maximum extent practicable with state agencies to prevent violations of Federally approved state water quality standards." 33 C.F.R. §337.2(a).  Even though Ohio's state water quality standards are federally approved, and the Corps had Congressional funding sufficient to satisfy the State's WQC conditions, the Corps' idea of cooperation was to simply abandon the dredging project altogether.  This course of action is more avoidance than cooperation.

---

[27]

  Even if a nongovernmental entity could decide the cost of compliance was too great and simply abandon the project, the Corps does not have this option.  It has other statutory obligations requiring it to proceed with certain projects, and to pay the compliance costs whenever practicable.

Agencies are bound to follow their own regulations. *Meister*, 623 F.3d at 371; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). The Corps' regulations do not direct the Corps to simply abandon a prioritized project necessary to ensure commercial navigation. Instead they anticipate and require that, "the district engineer will accommodate the state's concerns to the extent practicable." 33 C.F.R. §337.2(a).[28] Indeed, this is exactly how the Corps has operated in the past, and is how Commander of the Corps' Buffalo District recommended the Corps proceed in this instance.[29]

The U.S. EPA's regulations under Section 404(b)(1) of the CWA also preclude any discharge of dredged or fill material if there is "a practicable alternative to the proposed discharge which will have less adverse impact." See 40 C.F.R. §230.10(a). Regardless of whether the Corps believes that the sediment at issue will have significant long-term impact on the ecology of Lake Erie, it cannot legitimately dispute that CDF disposal of sediment containing PCBs would

---

[28]

  The agency's intent to make such accommodation mandatory is evidenced not only by the plain language of the regulation, but by looking at the change in wording from the originally proposed regulation. The originally proposed regulation stated that the engineers "*should* accommodate the state's concerns," while the actually adopted regulation states that the "engineers *will* accommodate the state's concerns." (emphasis added). *See* Proposed Amendment to Corps of Engineers Operations and Maintenance Regulations for Activities Involving the Discharge of Dredged or Fill Material in Waters of the United States and Ocean Waters, 51 Fed. Register 19694-01, 19704, 1986 WL 94513 (May 30, 1986).

[29]

The Corps did not alter its on-going determination that CDF disposal was the Federal Standard in 2014, despite its own findings that open-lake placement would be appropriate. Rather, when the State denied issuance of a WQC for open-lake disposal, the Corps cooperated, as required under the applicable statute and regulations and proceeded with CDF disposal. The same position was taken by the Buffalo District's Commander with regard to the 2015 project, however this position was reversed when the WQC application was submitted. (AR0004277-78; ECF #104-1, Index 52).

have less adverse impact on Lake Erie than placing the contaminated sediment into the lake.

Regulations enacted by both the Corps and the U.S. EPA require the Corps to look at whether the state's proposed alternative to open-lake placement of dredged material is "practicable." 33 C.F.R. §337.2(a), 33 C.F.R. §337.2(a), and 40 C.F.R. §230.10(a). The regulations define "practicable" as "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 33 C.F.R. §335.7; *see also* 40 C.F.R. §230.10(a)(2). In this instance, the State's proposed alternative to open-lake placement of dredged sediment is placement of the sediment in a CDF. There is currently a CDF available with sufficient capacity to hold the sediment in question. The Corps has used this CDF on prior projects, and had authorized its use under the Federal Standard for sediment from other sections of the dredged area in connection with the 2015 Cleveland Harbor project. In fact, the sediment at issue in this case has already been placed in the CDF as a result of this Court's issuance of a preliminary injunction.[30] There is no question, therefore, that this alternative was available and capable of being used based on technology and logistical considerations, at the time the Corps made its determination.[31]

---

[30] In fact, the CDF had enough additional space to hold the sediment that was obtained through the 2016 Cleveland Harbor dredging project. The parties agreed to place the 2016 sediment in the CDF and to await the Court's determination of who would be liable to bear the cost of that containment option.

[31] Defendant contends that CDF disposal for 2015 was not practicable because there was no "long-term alternative" to accommodate dredged material "on an annual basis and at a reasonable federal cost." (AR0005048). The regulations do not require a finding that the alternative be available for future projects, only that one is currently available. There is no question there was space available for the dredged materials that would be deposited from the 2015 project.

The only remaining question is whether CDF disposal is capable of being done taking cost into consideration.   It is undisputed that the Corps was allocated sufficient funds by Congress to pay for CDF disposal of the sediment in question as part of the 2015 dredging project.  Therefore, cost did not render the CDF disposal incapable of being accomplished .  CDF disposal was, therefore, practicable under both the Corps' and the U.S. EPA's definitions.  33 C.F.R. §335.7; 40 C.F.R. §230.10(a)(2).

The plain language of both sets of regulations requires the Corps to accommodate the state's concerns by choosing an alternative that avoids discharge of dredged materials and lessens the adverse impact of discharge, where practicable.  33 C.F.R. §337.2(a), and 40 C.F.R. §230.10(a).   The Corps' refusal to accommodate the State's WQC condition was a required action unlawfully withheld, that resulted in an unreasonable delay of the Cleveland Harbor dredging project.  Allowing an agency to abandon a project, merely because it prefers not to expend the money necessary to meet State water quality standards, would strip the above-cited statutes and regulations of any force and frustrate the clear intent of Congress.

3.     The Corps' Obligations to Comply With the Coastal Zone Management Act

Through the CZMA Congress has declared that it is the national policy "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations."  16 U.S.C. §1452(1).  This Act also directs the federal government and its agencies to "encourage and assist the states to exercise effectively their responsibilities in the coastal zone[32] through the development and implementation of management

---

[32]

  The coastal zone is defined as coastal waters and adjacent shorelands.  16 U.S.C. §1453(1).  Coastal waters are, in turn, defined as waters of the Great Lakes, withing the territorial jurisdiction of the United States, including their connecting waters, harbors,

programs . . . giving full consideration to ecological. . . values as well as the needs for compatible economic development." 16 U.S.C. §1452(2). It, in effect, creates a "federal-state partnership to ensure water quality and coastal management around the country, so that state standards approved by the federal government become the federal standard for that state." *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 143-44 (2nd Cir. 2008). Ohio's anti-degradation standard, as set forth in Ohio Admin. Code §3745-1-05, has been approved by the United States EPA, thereby becoming the federal standard for Ohio under the CZMA. Ohio's anti-degradation standard provides as follows:

> A significant lowering of water quality occurs when there is a new or increased loading of any bioaccumulative chemical of concern from any regulated existing or new facility, either point source or nonpoint source for which there is a control document or reviewable action including . . . deliberate activities that, based on the information available, could be reasonably expected to result in an increased loading of any bioaccumulative chemical of concern to any waters of the Great Lakes system.

O.A.C. §3745-1-05. U.S. EPA regulations define loading as "[a]n amount of matter or thermal energy that is introduced into a receiving water; to introduce matter or thermal energy into a receiving water." 40 C.F.R. §130.2. Read in connection with the U.S. EPA's definition of "loading," the Ohio standard adopted by the U.S. EPA will, therefore, find a "significant lowering of water quality" whenever there is a new deposit[33] of any bioaccumulative chemical, including PCBs, to any waters of the Great Lakes.

_____

etc.. 16 U.S.C. §1453(3)(a). Therefore, the Cleveland Harbor, including the Upper Channel qualifies as a coastal zone.

[33]

According to Ohio's water quality standards, the Upper Channel and Lake Erie are considered separate bodies of water. See, O.A.C. §3745-1-26(E); O.A.C. §3745-1-31. Therefore, any sediment from the Upper Channel that is placed into Lake Erie would constitute a "new deposit."

The Corps originally refused to acknowledge that Ohio's anti-degradation rule was relevant, maintaining that it's requirements exceeded the state's authority to determine water quality standards. (AR0003807; AR0004089; ECF #104-1 at PageID 9551). Following discussions with the Ohio EPA, the Corps nonetheless agreed to consider the anti-degradation rule, and determined that open-lake placement would not violate this standard "as USACE interprets it." (AR0004480). The problem with this position is that the Corps' interpretation of Ohio's regulations is not entitled to any deference. Congress delegated the authority to set and determine water quality standards to the U.S. EPA, who then delegated those duties to the states. The state's standard was adopted by the U.S. EPA, and taken directly from the U.S. EPA's model standard for water quality within the Great Lakes. 40 C.F.R. Pt. 132, App. E(A); O.A.C. §3745-1-05(F). The U.S. EPA in developing its model standards took into account the unique nature and importance of the Great Lakes, and recognized the potential damage that can occur from even short-term (temporary) discharges.

> The final Guidance also reflects the unique nature of the Great Lakes Basin
> Ecosystem by establishing special provisions for chemicals of concern. . . . The
> experience with such pollutants as . . . PCBs indicates that it takes many decades to
> overcome the damage to the ecosystem caused by even short-term discharges, and
> that prevention would have been dramatically less costly than clean-up.

Final Water Quality Guidance for the Great Lakes Systems, 60 Fed. Reg. 15366-01.

This standard advances the stated goals of Congress and is consistent with international policies aimed at eliminating the discharge of toxins into the Great Lakes. 33 U.S.C. §1251; S. Rep. No. 950370 (1977), 1977 U.S.C.C.A.N. 4326; Great Lakes Water Quality Agreement, Nov. 22, 1978, as amended by Protocol signed Nov. 18, 1987, U.S. –Can., Article II, 30 U.S.T. 1383. Therefore, if the State of Ohio has determined that any discharge of PCBs into the Great Lakes

results in a significant lowering of water quality, that is the standard that the Corps must also

apply when it determines whether its proposed alternative complies with state water quality

standards. [34]

This was not, however, the standard employed by the Corps in determining Section 404(b)(1)

compliance under the Federal Standard.

The Corps admits that the sediment it sought to deposit into the open waters of Lake Erie

contained PCBs, and that placement of the material dredged from the Upper Channel into Lake

Erie "may result in a temporary negligible increase in the benthic bioaccumulation of PCBs."

(ECF #46, PageID 3162; AR0005100). It has also admitted that one-third of the sediment from

the Upper Channel "did show a statistical increase in PCB bioaccumulation as compared to

reference sediment" chosen within Lake Erie. (AR0005089). Ohio's anti-degradation standard

states that a new deposit of any bioaccumulative chemical of concern, here PCBs, into the Great

Lakes, without regard to the duration of the potential effect, creates a "significant lowering of

---

[34]

  Defendant argues that accepting this standard would result in "the absurd result that the presence of a single PCB molecule in 180,000 cubic yards of otherwise pristine sediment would cause Ohio EPA to prohibit open-lake placement of that sediment." (ECF #115, PageID 10422). This is a hyperbolic argument that ignores what a finding of "significant lowering of water quality" entails. As the Defendant, itself, has pointed out, this finding does not automatically mean that there cannot be a discharge of the sediment. It does, however, trigger certain additional testing and procedural hurdles that are necessary to determine whether a discharge is, nonetheless, permissible. See, O.A.C. §3745-1-05(F)(3). One requirement that is triggered by such a finding is a federal statutory requirement under the National Environmental Policy Act ("NEPA"). Pursuant to NEPA, the Corps is required to evaluate the potential environmental impacts associated with their proposed disposal method. 42 U.S.C. §4332(c). NEPA regulations then require the Corps to prepare an environmental impact statement if there is a likelihood of a significant impact. 40 C.F.R. §1508.9(a)(1). In this case, the Corps issued a Finding of No Significant Impact under 40 C.F.R. §1508.13, in violation of the Ohio anti-degradation statute's definition of "significant impact."

water quality." Therefore, there should be no dispute that the Corps' plan for open-lake placement of PCB containing sediment would result in a "significant lowering of water quality" in Lake Erie, under Ohio's anti-degradation standard. Therefore, the Federal Standard determination by the Corps in this case was unlawful because the Corps exceeded its discretionary authority. It was required to apply Ohio's anti-degradation standard, and to accept the State's interpretation of its own standard.

In carrying out the goals of the CZMA federal agency activity affecting any land or water use or natural resource of the coastal zone is to be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies[35] of approved State management programs. 16 U.S.C. §1456(c)(1)(A). The State has determined that open-lake placement of Cleveland Harbor sediment is not consistent with the enforceable policies of the State water pollution management programs and standards. However, relying on 33 C.F.R. §336.1(a)(2), the Corps argues that it does not have to act in accordance with the CZMA if it determines that the State's alternative is not practicable, and its own proposed alternative is consistent with the programs "to the maximum extent practicable."

The Corps appears to read the "maximum extent practicable" condition as a grant of authority to override State compliance determinations and implement its own findings under the Federal Standard. However, the phrase "maximum extent practicable" does not give the Corps

---

[35] Enforceable policies are "[s]tate policies which are legally binding through constitutional provisions, laws, regulations, land use plans, ordinances, or judicial or administrative decisions, by which a State exerts control over private and public land and water uses and natural resources in the coastal zone." 16 U.S.C. §1453(6a). The Corps has not disputed that Ohio EPA's decisions awarding, denying, or setting conditions on the issuance of a water quality certificate are enforceable policies.

unbridled discretion to refuse the costs of compliance, nor does it legitimize the Corps' position that the Federal Standard can operate to override its obligation to abide by state environmental standards. *See, Overton Park,*, 411 U.S. at 402 (finding that the phrase "no feasible and prudent alternative" did not widen the agency's discretion, or make the discretion standardless). This is especially true when, as here, the term "practicable" has been given a specific meaning by both Congress and the agency, which definition provides a meaningful standard for determining the limits of agency's discretion in such matters. As set forth above, CDF disposal is required by the State's management program, is clearly a more protective alternative to open-lake placement, is the alternative that best satisfies the requirements of the CZMA, and is practicable under the statutory and regulatory definitions of the term. Therefore, open-lake placement is not consistent with the CZMA requirements "to the maximum extent practicable."

The Corps' position that open-lake placement satisfies the CZMA is unfounded. Allowing its own Federal Standard determination to supercede its obligations under the CZMA is unlawful because it gives the agency power in excess of its Congressionally delegated authority.

**4.     The Corps' Obligation to Comply with The Great Lakes Water Quality Agreement**

Even if the Corps had the authority to override the State's determination of the required WQC conditions, it did not apply the proper standards under the Great Lakes Water Quality Agreement, which was adopted by Congress, and become binding on all agencies. 33 U.S.C. §1268. In adopting the Great Lakes Water Quality Agreement, Congress declared that "the United States should seek to attain the goals embodied [therein]. . . with particular emphasis on goals related to toxic pollutants." The Great Lakes Water Quality Agreement, Nov. 22, 1978, as amended by Protocol signed Nov. 18, 1987, U.S. – Can., Article II, 30 U.S.T. 138, states that "it is

the policy of the Parties that . . . the discharge of any of all persistent toxic substances be virtually eliminated."

Through this treaty, the United States agreed to "eliminate or reduce to the maximum extent practicable the discharge of pollutants into the Great Lakes System." *United States v. Michigan*, 777 F.Supp. 1365, 1368 (E.D. Mich. 1991).[36] As discussed above, applying the Federal Standard, which requires implementation of the least costly sediment disposal alternative within the Corps' interpretation of the parameters of Section 404(b)(1) of the CWA, and allowing the discharge of PCBs into the Great Lakes, conflicts with the Corps' statutory obligation to eliminate or reduce the discharge of pollutants to the maximum extent practicable.

**5.     The Corps' Obligation to Use the Great Lakes Testing Manual**

Generally the Corps is to be afforded a great deal of deference in how it calculates its own standards, and in its fact-finding processes. *See, Arkansas v. Oklahoma*, 503 U.S. 91, 110-13 (1992). There is a vast and detailed record outlining numerous scientific studies, communications between the parties, and records of the Corps' consideration of available resources and budgetary constraints. There are conflicting scientific standards applied by the parties in this case, and divergent conclusions reached by qualified scientists on both sides. With some stated exceptions, discussed below, the Court need not and will not second guess the conclusions reached by the Corps in the application of its own scientific testing. Nor will this Court second-guess the Corps' determination of which scientific testing methods are appropriate for establishing the discharge criteria under its own regulations. "When specialists express conflicting views, an agency must

---

[36] International law is part of our federal law and is enforceable by the courts. *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 730 (2004).

have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *March v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

There is an exception to such deference, however, when the Corps chooses to apply standards that conflict with its own regulations. As noted above, an agency is legally bound to follow its own regulations. If the Corps is dealing with the potential discharge of contaminated materials, its own regulations require it to follow the most current published version of the technical manual for contaminant testing and controls. 33 C.F.R. §336.1. Plaintiff contends, and Defendant does not dispute that the Great Lakes Testing Manual ("GLTM") is the most recent published testing manual applicable to contaminant testing and controls for discharges into the Great Lakes. *(See*, AR0003723; AR-SUPP0288897; AR-SUPP0288905-06). [37]

The GLTM is a supplement to the national testing and evaluation guidance to be applied in accordance with 404(b)(1) Guidelines, and applies specifically to the Great Lakes. (AR0000585; AR0000581). The GLTM dictates that if contaminant concentrations in tissue exposed to the dredged material is statistically greater than that of tissue exposed to disposal site material, the dredged material is considered to have unacceptable adverse impacts on benthos. (AR0000790). Despite its admission that one-third of the sediment from the Upper Channel "did show a statistical increase in PCB bioaccumulation as compared to reference sediment from CLA-1" and that this finding would violate the Great Lakes Testing Manual's criteria for open-lake placement, the Corps maintained its position that open-lake placement for all sediment from the Upper

---

[37] The Corps has acknowledged that the use of both the GLTM and the ITM is appropriate and required. (AR0003778; AR-SUPP0288897).

Channel was appropriate.  (ECF #104-1, at PageID 9526-27).

Rather than look to state or federal statutory authority or follow its own regulatory requirement to apply the GLTM, the Corps relied on general guidance from the Inland Testing Manual ("ITM")(which it co-authored, and which creates no "legally-binding requirements on Federal agencies, States, or the regulated community,")[38] and the American Society of Testing and Materials (an independent standard-setting organization).  The Corps also employed the Spatially Explicit Screening Level Exposure Comparison ("SESLEC") method which is an unpublished testing method.[39]  Relying on these methods, the Corps concluded that the statistical increase in PCB bioaccumulation that would occur by placing the sediment in question into Lake Erie would not be "ecologically meaningful."[40]  (ECF #104-1, at PageID 9485; AR0001665; AR0001682; AR0005089; AR0003640; AR0003785).   Consequently, it found open-lake placement of the sediment to be acceptable.

The Corps' conclusion contradicts not only the GLTM guidelines, which it was obligated

---

[38] This quote is taken from the introduction of the ITM.

[39]  The Corps argues that consideration of the SESLEC methods is irrelevant because that model was only applied to data from the CLA-4 site.  The Corps did not apply the SESLEC method to the CLA-1 site because it was too contaminated to use in the model (AR-SUPP0675520).  The SESLEC study of CLA-4 was also mentioned in the documentation supporting the Corps' finding that CLA-1 would be an appropriate site for disposal of the Upper Channel sediment.  (AR-SUPP0675520; AR-SUPP0289904; AR004742; AR0005040; AR0005089-90).

[40] The Corps has not cited to any section of the ITM that would conflict with the GLTM requirement that no sediment with a statistical increase in PCB bioaccumulation should be discharged into the Great Lakes.

to apply under 33 C.F.R. §336.1, but also the ITM guidelines it inexplicably chose to use instead.[41]

The ITM, itself, requires compliance with 33 C.F.R. §336.1, which in turn requires use of the

GLTM. (AR-0000080). It specifically states that "[d]redged material evaluated under the

procedures described in this manual must also satisfy all other applicable requirements of 40

C.F.R. §230-232, 33 C.F.R. §320-330, and 33 C.F.R. §335-338 in order to comply with the

Guidelines and to be authorized for discharge." Therefore, the failure to apply the GLTM

guidelines also equates to a failure to properly apply the ITM guidelines.

Further, the ITM acknowledges that "some dredged material evaluated in accordance with

technical procedures in this manual may demonstrate a potential for unacceptable environmental

impacts or not meet Federally approved State WQS," and in such case directs the agency to

evaluate whether other "management options (e.g., alternative dredging and discharge methods,

alternative discharge sites, confined disposal, capping, site controls such as covers and/or liners)

will be necessary to determine whether the proposed discharge can be made acceptable or can be

brought into compliance with the Guidelines and State WQS. " (ITM 2-6). Any such evaluation

[41]

Plaintiff also rgues that ITM also does not support the choice of CLA-1 as a reference
site. "[A]doption of a reference sediment that is unimpacted by previous discharges of
dredged material will result in a more scientifically sound evaluation of potential
individual and cumulative contaminant-related impacts." (ITM 3.2.1). There is no
dispute that CLA-1 had been subject to prior contaminated discharges. However, the
Corps' scientists evaluated this location for impact from the past discharges and
determined that there was no on-going impact from the previous contamination.
(AR0003773; 3774; AR0003810; AR0004099; AR0003776-77; AR0005068;
AR0003777; AR0004145; AR0003778; AR0004737-38). The Corps compared the PCB
data to other areas of Lake Erie not immediately surrounding Cleveland. Plaintiff
contends that these locations were not appropriate reference sites because they could not
have been used for disposal of the sediment at issue. Whether the Court agrees with
Plaintiff or Defendant on this issue, the Corps is entitled to deference on this finding as it
has Plaintiff has cited no statutory obligation limiting the Corps' reference sites to the
Cleveland area.

would have resulted in a finding that the discharge could be brought into compliance by use of CDF disposal.

Even though the Corps uses the ITM guidelines to justify its findings, it maintains that because the ITM is not binding legal authority, any failure to adhere to a specific section of the guidelines cannot support a finding of arbitrary and capricious action. *See, Southern Forest Watch Inc. v. Jewell*, 817 F.3d 965, 973 (6th Cir. 2016); *Reich v. Manganas*, 70 F.3d 434, 437 (6th Cir. 1995). This is just one more example of how the Corps has attempted to reason itself free from its legal obligations. The Corps cannot avoid its obligation under a properly enacted regulation to follow a particular guideline simply by replacing it with a guideline of it own choosing. Further, even if the Corps did have the authority to substitute the ITM for other legally binding guidelines, it must, at least, then treat the ITM as a binding replacement. *See generally*, *Diebold v. United States*, 947 F.2d 787, 804-805 (giving credence to Comptroller General's decision that the agency's failure to follow their own handbook was reviewable error). An agency cannot replace a legally binding guideline with one that is not binding. 33 C.F.R. §336.1; *see also* 33. C.F.R. §336.1(b)(8). To hold otherwise would expand the authority of this agency, allowing the Corps to free itself of any legally binding limitations whenever it wished. The Corps does not have the authority to simply disregard or eliminate any requirements or restrictions it is subject to by statute or by its own properly enacted regulations. The attempt to do so can indeed be considered arbitrary and capricious, unlawful, and/or in excess of its delegated authority.

6. **The Corps' Obligation to Pay Compliance and Operation/Maintenance Costs**

The Corps argues that it cannot be forced to spend money to meet standards or conditions

-38-

it disagrees with.  It also argues that even if it is required to cooperate with the state and implement other alternative methods of disposal, it has the right, and, in fact, the obligation to require affected non-federal parties to bear any cost for such alternatives above and beyond what is approved by the agency under the Federal Standard.  (AR-SUPP0000001)("I am not authorized under 33 C.F.R. section 337.2 to use federal funds to place material in a manner that is inconsistent with the Federal standard determination.").  There is, however, no statutory authority for such a claim, and the Corps' own regulations do not provide any basis for claiming such a right.  While there may be an argument that the Corps cannot be forced to spend money it does not have, the idea that it does not have pay the costs of complying with State water quality standards, as interpreted by the State, when Congress has allocated sufficient funds for it to do so, runs contrary to both Congressional directives and Congressional intent.

In addition to the Corps' statutory duties to  "eliminate or reduce to the maximum extent practicable the discharge of pollutants into the Great Lakes System," and to accommodate State required disposal alternatives whenever practicable, Plaintiff cites 33 U.S.C. §2211(b) as a basis for its position that Defendant is required to pay one hundred percent of the costs associated with the dredging and disposal of sediment from the Upper Channel.

Title 33 U.S.C. §2211(b) dictates that "[t]he Federal share of the cost of operation and maintenance of each navigation project for a harbor or inland harbor constructed pursuant to this Act shall be 100 percent."  33 U.S.C. §2211(b).[42]  Despite the unambiguous language of this provision, Defendant argues that this statute does not require it to bear the cost of the Cleveland

---

[42] Defendant does not contest the fact the Cleveland Harbor, including the Upper Channel, is a "navigation project" subject to the directives of 33 U.S.C. §2211(b).

Harbor project because it is a "general" statute that does not specifically reference payment for operation and maintenance costs of the Cleveland Harbor. It is true that this statute does not name the Cleveland Harbor, or specifically refer to operation and maintenance costs for the 2015 project. However, once the Corps exercised its discretion under 33 U.S.C. §426o-2 by determining that this specific project should be funded, and Congress authorized and funded the project, the 2015 Cleveland Harbor project became "a navigation project" subject to the cost requirement of Section 2211(b). At that point, the Corps was required to bear one hundred percent of the costs associated with the project. To hold otherwise would strip the statute of any meaning. Because this statute does not identify any specific project, the Corps could render it meaningless by simply refusing to proceed with any operation and maintenance project if it unilaterally decided it did not want to pay the associated costs. A statute cannot be interpreted in a way that renders it meaningless. *See, e.g., Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

Defendant also argues, yet again, that its own Federal Standard overrides this statutory mandate to pay the full cost of the project. The law is clear, however, that the Corps cannot adopt and enforce agency regulations that conflict with a statutory directive. Congressionally passed statutes trump agency regulations. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842; *Kentucky Waterways Alliance*, 540 F.3d at 474. Rather than ignoring this statutory directive because it conflicts with the Federal Standard, as it did, the Corps was required to disregard the Federal Standard to the extent that it conflicts with this Congressional directive. As the U.S. Supreme Court has stated, the determinative question when reviewing the scope of agency authority is "not what the [agency] thinks it should do but what

Congress has said it can do." *Civil Aeronautics Bd v. Delta Air Lines, Inc.*, 367 U.S. 316, 322 (1961); *see also, National Petroleum Refiners Assoc. v. FTC*, 482 F.2d 672 (D.C. Cir. 1973).

The Corps also cites 33 C.F.R. §337.2(b) as a basis for its inability to accommodate the state's requirements without financial contribution from a non-federal party. Yet again, the Court will point out that an agency cannot adopt and enforce agency regulations that conflict with a statutory directive. Even if this regulation could be harmonized with 33 U.S.C. §2211, it does not permit the Corps to demand non-federal funding for water quality compliance costs, or to defer dredging under the circumstances at issue in this case.

The regulation does set forth the agency guidelines for what the Corps may do "[i]f the state agency imposes conditions or requirements which exceed those to meet the Federal standard" and those conditions or requirements "cannot be reasonably accommodated." It does not impose any prohibition against choosing a state compliant alternative to the Federal Standard, nor does it require the Corps to seek non-federal financial contribution to fund such an alternative. The regulation does direct the district engineer to "accommodate the state's concerns to the extent practicable," which as set forth above could have been accomplished in this case. Even if accommodation was not practicable, however, the regulation does not require non-federal financial contributions.

33 C.F. R. §337.2(b)(1) states that cost-sharing may be requested if the state requires monitoring or testing beyond what is required in establishment of the Federal Standard, which is not the situation in this case. The state did not require additional monitoring or testing. Further, the regulation allows for a deferral of dredging if the state denies water quality certification. 33 C.F. R. §337.2(b)(3). In this case, the state issued a conditional water quality certification, but

did not deny certification.   Guidelines for conditional certification are set forth under 33  C.F. R.

§337.2(b)(2) and are as follows:

> When an agency requires special conditions or implementation of an alternative
> which the Federal standard does not, district engineers will proceed as follows: In
> those cases where the project authorization requires a local sponsor to provide
> suitable disposal areas, disposal areas must be made available by a sponsor before
> dredging proceeds.  In other cases where there are no local sponsor requirements to
> provide disposal areas, the state or the prospective local sponsor will be advised
> that, unless the state or the sponsor provides suitable disposal areas, the added
> Federal cost of providing these disposal areas will affect the priority of performing
> dredging on that project.  In either case, state will be made aware that additional
> costs to meet the state standards or the requirements of the coastal zone
> management program which exceeds those necessary in establishment of the
> Federal standard may cause the project to become economically unjustified.

33 C.F.R. §337.2(b)(2).

There is no agency rule that allows, let alone requires, the Corps to charge all costs of the

State's proposed disposal alternative to a state when the state issues a conditional WQC.

Even if the Court assumes that the Corps has the statutory authority to require local sponsorship of

disposal areas as presumed by the regulation, there is no evidence in this case that the Cleveland

Harbor project authorization contained any such requirement.  Further, there is no evidence that

the additional federal costs of providing disposal areas affected the priority assessment for the

dredging of the Cleveland Harbor.  To the contrary, the priority of dredging the Cleveland Harbor

was determined in advance of the determination of the Federal Standard.  "The need and

justification for operations and maintenance work are made during the Army Civil Works annual

Congressional budget review process."  52 Fed. Reg. 14902-01.  That justification process took

into account the costs of disposing of all dredged sediment in CDFs.  (ECF #13-20, PageID 915

(Fiscal Year 2015 Civil Works Budget of the U.S. Army Corps of Engineers)("The Budget

provides $2.6 billion for the Operation and Maintenance account.   The Budget gives priority to

those coastal harbors and inland waterways with the most commercial traffic, and increases the total amount to be spent from the Harbor Maintenance Trust Fund to $915 million, a level that is higher than in previous budgets. The Budget also funds harbors that support significant commercial fishing, subsistence, or public transportation benefits, although at a lower rate than in most prior years." ); AR-SUPP1086688 (the fiscal year 2015 budget was "programmed in fiscal year 2013 when the Corps did not know that open-lake placement was even an option. That budget included O&M funds for "mechanical placement, and included some Construction General Funding to allow "some improvements to the current CDF to allow for placement of material if needed.")). It would be arbitrary and capricious for the Corps to de-prioritize the dredging of this highly important commercial Upper Channel based on the cost of CDF disposal, when that cost was incorporated into the authorization and budget request at the time the project was originally considered and prioritized.

Finally, Defendant argues that it also has a competing statutory obligation under 33 U.S.C. §419a to take measures to extend the capacity of dredged material disposal areas by not placing materials in CDF's unnecessarily. This provision is not aimed at reducing the federal costs associated with operation and management of the Great Lakes Harbors, or reclassifying potentially toxic sediment to avoid use of the CDFs. Rather, it seeks to spur the Corps to develop management methods, in combination with the States, for reducing or consolidating the volume of material disposed of through such means as "construction of dikes, consolidation and dewatering of dredged material, and construction of drainage and outflow facilities." *Id.* The obligation to extend the capacity of disposal areas does not give the Corps a pass on complying with state disposal requirements, and should not be read in such a way as to create a conflict with other

-43-

statutory obligations.

Congress has said that the Corps must comply with state and international water quality regulations and standards; the Corps must accept the state's determinations with regard to those regulations and standards; the Corps must accommodate the State's compliance conditions and eliminate the discharge of toxins whenever, and to the maximum extent practicable; and, the Corps must pay one hundred percent of the operation and maintenance costs for this type of harbor project. Failing to take these actions based on an erroneous view of the scope of its discretion and the power of its Federal Standard, was unlawful and in excess of its statutory authority.

**7.        The Corps' Obligation to Dredge**

As set forth above, dredging operations for the operation and maintenance of navigational features of the Great Lakes and Connecting Channels are duties that are delegated to the Corps through the WRDA. Specifically, 33 U.S.C. §426o-2 (Section 5014(a) of the WRDA) requires that the Corps, "[u]sing available funds . . . shall expedite the operation and maintenance including dredging of the navigation features of the Great Lakes and Connecting Channels for purposes of supporting commercial navigation to authorized project depths."

The Corps argues that it has the right to refuse dredging based on a disagreement between the Federal Standard and the State's WQC requirements because this statute, by nature of its vagueness, allows the Corps discretion to prioritize projects fitting within the statute's scope. The fact that the Corps is allowed to exercise discretion in prioritizing projects is not actually relevant to the question at hand, however, because it exercised that discretion in favor of dredging the entire Cleveland Harbor in 2015. The statute does not give the Corps discretion to avoid its statutory and regulatory obligations in the process of carrying out a prioritized project.

The evidence in this case shows that the cost of CDF disposal had no effect on the Corps' original decision to prioritize this project. The Corps has acknowledged the importance of this harbor, and the economic hardships that would result not only locally, but throughout the country, if dredging were not regularly maintained. (AR-SUPP0101835 (April 2014 Letter from Corps District Commander Owen J. Beaudoin); AR-SUPP0128557-58 (March 2014 Corps Issue paper); AR-SUPP0110077: (Corps' Application for 401 Permit); AR0004724; AR0004592; AR0005054; AR0005641-48).[43] Plaintiff has cited a forty-year history of Congressional support and acknowledgment of the need to dredge this Upper Channel in order to facilitate commercial, deep-draft navigation.

Further, the Corps had available funds to satisfy the state's conditions and to accomplish the project in an expeditious manner.[44] In an email to LTC Karl Jansen, the Corps Commander and District Engineer, dated June 16, 2014, Ronald Kozlowski indicated that the Corps' budget/program funds for the 2015 dredging project included O&M funds for "mechanical placement," and included some Construction General Funding to allow "some improvements to

---

[43]

"The large industrial base that depends on the harbor to transport commodities would no longer be able to do so cost-effectively. The harbor would no longer be a viable alternative for the transportation of goods. This would negatively impact the annual $1.7 billion in direct revenue; over 15,000 direct, indirect, and induced jobs; and $1 billion in personal income generated by the continued viability of the Harbor. Losses of between one and two feet of channel depths would result in increased transportation cost between $2.3 million and $5.2 million annually."

[44]

Congress has allocated funds to allow CDF disposal of the sediment obtained by dredging the Cleveland Harbor nearly every year since the CWA was enacted, except during a short period in the 1990s where the sediment was used for beach nourishment. Congress again allocated funds for the 2015 project, including sufficient funding to satisfy the State's condition for CDF disposal of the sediment from the Upper Channel. (AR-SUPP1086688).

the current CDF to allow for placement of material if needed." (AR-SUPP1086688). The email also noted that "we have more than enough O&M funds to mechanically place material." However, if open-lake placement were achieved, "nearly $2M in LRB excess funding would be offered up to HQ USACE for other high priority needs." (AR-SUPP1086688). The Fiscal Year 2015 Civil Works Budget of the U.S. Army Corps of Engineers lists a line item budget amount for various project in various states, and shows an allocation of $5,729,000 from construction, and $7,634,000 from operation and management for navigation in the Cleveland Harbor. (ECF #13-20, Page ID 950 (Fiscal Year 2015 Civil Works Budget of the U.S. Army Corps of Engineers)).

The Corps does not dispute that it had available funds from Congress to complete the project in accordance with the State's WQC conditions. Instead it argues that it was legally allowed to redistribute funds obtained in connection with this project for some other use. Relying on *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), Defendant claims that it is allowed to "reprogram" funds by shifting funds originally set aside for one purpose to another purpose within the same appropriation. Congress' purpose in allowing the re-programming of funds is the recognition that agencies may need to make adjustments for "unforeseen developments, changing requirements, . . . and legislation enacted subsequent to appropriations." *See In re Ltv Aerospace Corp.*, 55 Comp. Gen. 307, 318 (1975). [45] In this case, Defendant has not provided any evidence of unforseen developments, changing requirements, or legislation enacted subsequent to the appropriations that would justify any such "reprogramming." When the budget was requested, the Corps specifically

45

Comptroller General opinions are not binding on courts, but provide "expert opinions, which they should prudently consider." *Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1084 (Fed. Cir. 2003), *aff'd sub nom. Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, (2005).

sought funds for dredging of the Cleveland Harbor, including disposal of all of the dredged sediment in CDFs. It was granted funding sufficient to accomplish this request. There was no added requirement or unforseen increase in cost to this project nor is there any evidence that the circumstances surrounding some other potential project changed in a way that would have affected its priority relative to the Cleveland Harbor project.

The Federal Standard determination does not count as a changed requirement because it is a self-imposed standard that cannot be treated as mandatory when it conflicts with other federal, state or international law pertaining to water quality. By treating the Federal Standard as "the primary method of determining the proper management practices for dredge sediment," (AR-SUPP0638872 at ¶ 4.b.i (Decision Brief for 2014 Cleveland Dredging 401 Permit Application)), the Corps has improperly elevated this internal agency rule over a Congressional directive to "use available funds" as necessary to perform its duties under 33. U.S.C. §426o-2, and to comply with federal, state, interstate, and local environmental protection requirements to the extent practicable.

The Corps cannot reprogram funds based on conditions not approved or anticipated by Congress, and certainly cannot do so when those funds are needed for their original purpose in order for the agency to remain in compliance with governing law. An agency decision is arbitrary and capricious if it relies on factors Congress has not intended for it to consider. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2529, 168 L. Ed. 2d 467 (2007); *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Sierra Club v. United States Forest Serv.,* 828 F.3d 402, 407 (6th Cir. 2016).

Finally, although the Corps has declared its desire to use the disputed funds for other projects, it has not provided any evidence or argument to suggest that the money saved through

open-lake placement would otherwise be used in furtherance of the Corps' duties under 33 U.S.C. §426o-2. [46] This statute may not have a specific directive requiring the Corps to dredge the Upper Channel, but it does specifically require that the Corps "use available funds" to expedite the operation and maintenance of navigation features of the Great Lakes and Connecting Channels in support of commercial navigation. It is required to use available funds, and to use them for a specific purpose. Under the plain language of that statute, the Corps does not have discretion to return the funds to Congress or to spend them on other projects outside the scope of this statute.

Using the available funds, the Corps could have easily satisfied its obligations under 33 U.S.C. §426o-2 and expedited the dredging of the Upper Channel, while simultaneously satisfying all of the statutory and regulatory obligations discussed above. Nevertheless, when the State issued its conditional water quality certification, requiring CDF disposal of the dredged materials, the Corps did not appeal[47] or otherwise legally challenge the State's decision,[48] nor did it abide by

---

[46]

The Corps speaks generally of its duty to balance the operations and maintenance requirements amongst multiple projects in many locations. It does not, however, identify any project that it would prioritize above the dredging project for the Cleveland Harbor, even taking into account the cost required for CDFdisposal.

[47]

The Corps has argued throughout its briefing that the State had no basis to determine that open-lake placement was not permissible, and that it had admitted this fact at various times. *See, e.g.*, ECF #104-1, PageID 9488-89. This is an issue that could have been presented on an appeal of the WQC condition. If the State, indeed, had no basis for its decision, the Corps should have been able to meet its burden on such appeal. The basis for the State's decision, however, is not relevant to the ultimate question before this Court in this litigation, which is whether the Corps' determinations were lawful and within its scope of authority.

[48]

The Corps could have claimed a right to proceed with open-lake placement regardless of the State's certification decision, in order to maintain navigation in the Upper Channel pursuant to 33 U.S.C. §1344(t), sought higher authorization through the procedures of 33 C.F.R. §337.8, or sought a Presidential override of the State's decision under 33 U.S.C.

other statutory and regulatory direction requiring that it accommodate the State's concerns when practicable. Rather it simply refused to dredge the Upper Channel. Regardless of the definition the Corps wants to assign to the word "expedite," refusing to complete an authorized and fully funded project that fulfills all of the Corps' statutory obligations does not satisfy a duty to expedite that work.

Congress clearly intends for the Corps to act when it has determined that dredging is necessary to maintain navigation. Support for this position is also found in 33 U.S.C. §1344(t), which states that

> Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such state, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements. This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

The final sentence of this section provides evidence that Congress intended the Corps' obligation to maintain navigation to be its highest priority. Although this section does not relieve the Corps from its obligation to comply with State and international requirements whenever possible,[49] it recognizes that the maintenance of navigation may even take priority over the State's environmental concerns.[50] It is clear from this statute that when an irreconcilable conflict arises,

---

§1323(a).

[49] "Sections of a statute generally should be read to give effect, if possible, to every clause," *Heckler v. Chaney*, 470 U.S. 821, 829, 84 L. Ed. 2d 714, 105 S. Ct. 1649 (1985).

[50] A decision to proceed with operations necessary to maintaining navigation despite

-49-

however, the proper course is NOT to allow navigation to be impaired.  Nonetheless, this was the

avenue chosen by the Corps in this case.

The Corps' decision to abandon a project that would dredge a commercially significant

channel of the Great Lakes, which is becoming dangerously close to being commercially

unnavigable, when both the specific project and its funding had already been approved by

Congress, simply because it did not want to pay the costs of complying with the State's water

quality certification requirements, violates its statutory obligations under 33 U.S.C. §426o-2 (as

well as a multitude of other statues and regulations discussed above).  It also exceeds the scope of

the Corps' discretionary authority under the statute.  The decision not to dredge the Upper

Channel under the circumstances existing in this case is, therefore, invalid and must be set aside

pursuant to 5 U.S.C. §706(2)(C).  Because the Corps' decision relied on a misinterpretation of the

mandatory nature of the Federal Standard, and misapplied the law relating to reprogramming

funds, it is also a decision that is not in accordance with the law under 5 U.S.C. §706(2)(A).


## CONCLUSION

---

irreconcilable conflicts with State environmental protection standards is not one to be
made lightly, and is not to be made by the district engineer.  There are regulatory
procedures that must be followed in order to obtain approval to implement such a
decision.  For example, 33 C.F.R. §337.8 requires district engineers to report to and seek
guidance from a higher authority when the state does not concur in a coastal zone
consistency determination, or attempts to concur with conditions or when the state denies
"or unreasonably delays" a water quality certification or issues the certification with
conditions that significantly exceed the Federal Standard, in order to allow the Corps to
determine the urgency of the project, the need for additional Congressional
appropriations, or the "need to exercise the Corps' ultimate authority to maintain
navigation."  In addition, 33 U.S.C. §1323(a) requires specific action be taken if the
Corps seeks to avoid environmental requirements in furtherance of preserving navigation.

For the reasons set forth above, the Court finds that the Corps' determination that the sediment from the Upper Channel could be deposited in Lake Erie without violating Section 404(b)(1) of the Clean Water Act, was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the applicable law. That decision is, therefore, reversed pursuant to 5 U.S.C. §706(2)(A). In addition, by treating its own determinations under the Federal Standard as the ultimate authority on the State's water quality certification standards, and elevating that regulation above its other statutory and regulatory obligations, the Corps exercised power in excess of its statutory jurisdiction, authority, or limitations. Thus, the Corps' decision to rely solely on the Federal Standard when determining what disposal method was permitted and/or required is also reversed pursuant to 5 U.S.C. §706(2)(C).

Once the Corps exercised its discretion to prioritize the 2015 Cleveland Harbor Dredging Project and that project was funded by Congress, the Corps was statutorily required to use all available funds to execute the project, and was required to comply with State WQC conditions when disposing of the dredged sediment. Because the Corps received funding to cover the full costs of that compliance, and has been directed by Congress to pay for one hundred percent of the costs of such operation and maintenance projects, it unlawfully withheld and/or unreasonably delayed the dredging of the Upper Channel when it refused to dredge that channel unless it received non-federal funding to cover the cost of CDF disposal. This Court, therefore, has a duty under 5 U.S.C. §706(1) to compel the Corps to dredge the Upper Channel, and to pay the full cost of CDF disposal for the collected sediment from that channel.

The Plaintiff's Motion for Summary Judgment (ECF #101) is GRANTED. The Defendant's Cross-Motion for Summary Judgment (ECF #104) is DENIED. The Defendant is

ordered to the pay costs associated with the CDF disposal of all dredged sediment from the 2015

Cleveland Harbor Dredging Project.   Such payment shall be authorized and arranged by the

Secretary of the United States Army and/or the Assistant Secretary of the Army for Civil Works.

IT IS SO ORDERED.




    /s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATE:   May 4, 2017